# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Wilborn**, 2011 IL App (1st) 092802

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH WILBORN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-2802 |
| Opinion filed<br>Modified upon denial<br>of rehearing | September 23, 2011<br><br>February 24, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for first-degree murder, defendant's *pro se* postconviction petition alleging that his trial counsel was ineffective in failing to present the exculpatory testimony of his codefendant and that his appellate counsel was ineffective in failing to raise that issue on appeal was properly dismissed as frivolous and patently without merit, the decision not to call codefendant was a product of sound trial strategy based on the determination that calling codefendant would not be in defendant's interest. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-22104 (02); the Hon. John J. Moran, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, and David T. Harris, Assistant Public Defender, both of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Sheilah C. O'Grady, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justice Palmer[1] concurred in the judgment and opinion. |
| | Justice Garcia specially concurred, with opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant Joseph Wilborn[2] was convicted of first-degree murder. 720 ILCS 5/9-1(a)(1) (West 2000). After hearing aggravation and mitigation, defendant was sentenced to 55 years in the Illinois Department of Corrections, 30 years for the first-degree murder and 25 years as a firearm enhancement. Defendant's conviction was affirmed on direct appeal (*People v. Wilbourn*, No. 1-06-2088 (2008) (unpublished order under Supreme Court Rule 23)). Defendant then filed a petition for postconviction relief in which he claimed ineffective assistance of trial and appellate counsel. The trial court dismissed defendant's postconviction petition at the first stage of the proceedings, finding that: (1) the issues presented in the petition are barred by the doctrine of *res judicata*; (2) defendant's allegations were conclusory and the petition lacked supporting documentation; and (3) the petition is frivolous and patently without merit. Defendant now appeals, and we affirm. See *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010) (we may affirm the decision of the trial court on any grounds substantiated by the record, regardless of the trial court's reasoning).

---

[1]Justice Robert Cahill originally sat on the panel of this appeal and participated in its disposition. Justice Cahill passed away on December 4, 2011. Therefore, Justice Palmer will serve in his stead and has read the briefs, record and the decision, which is the subject of the petition for rehearing.

[2]Defendant's direct appeal records use the spelling "Wilbourn" for his last name. However, his postconviction records, as well as his signature on his postconviction filings, use the spelling "Wilborn" for his last name. In this decision we will use the spelling of defendant's last name found on his postconviction petition and records.

¶ 2                                    I. BACKGROUND

¶ 3        Defendant and codefendant, Cedrick Jenkins, were arrested and charged by indictment
with the first-degree murder of Emmit Hill (victim). The trial court granted defendant's
motion for severance and defendant's jury trial commenced on June 12, 2006.

¶ 4        During opening statements, defense counsel told the jury that "you'll see and hear from
Jenkins." He stated that the victim had "problems" with defendant and Jenkins, and that
Jenkins "will talk to you about [their] relationship with [the victim]." He also told the jury
that the victim had approached defendant and Jenkins on the day of the shooting, accused
Jenkins of "being out and looking for him with [a] gun," and told Jenkins that "I'll have this
neighborhood flooded and you won't get out." Defense counsel further stated as follows:

>      "[Jenkins] will tell you what happened inside that gangway [where the victim was found
>      shot]. It won't be the same story that you here from [another witness] but the facts of who
>      pursued, who wouldn't let this go, who having seen what he regards as suspicious,
>      disregards it and it follows him through that gangway anyway ***."

¶ 5        Following opening statements, the State called eight witnesses: (1) Frederick Sanders;
(2) Clarence Morgan; (3) David Parker; (4) Chicago police detective Mike Qualls; (5) Stacey
Daniels; (6) Chicago police officer Andre Bedford; (7) forensic investigator John Kaput; and
(8) Cook County medical examiner Dr. Valerie Arangelovich.

¶ 6                              A. Frederick Sanders's Testimony

¶ 7        Sanders testified that, at approximately 11:30 p.m. on July 28, 2004, he exited his
apartment building located on the 6200 block of South Michigan Avenue and walked to his
automobile where his friend, Randy Griffin, was waiting in the passenger seat. Sanders
testified that Griffin told him that he had heard "a couple of gunshots" while he was waiting.
Sanders then drove his vehicle westbound on 63rd Street to Wabash. Sanders testified that
when he turned north, he observed a person he knew by the nickname of "Moochie," whose
real name is Samuel Richards, standing over a body lying in a gangway located near the
northeast corner of 63rd Street and Wabash. Sanders testified that he then stopped his
vehicle, exited it, and telephoned the police with his cellular telephone. While he waited for
the police to arrive, he did not observe anyone in the area with a gun, nor did he observe
Richards remove a handgun from the body. He did not observe defendant or Jenkins in the
area.

¶ 8        Sanders also testified that he was not friends with defendant, the victim or Jenkins. He
testified that he knew defendant because he observed him "being around the [apartment]
building." In addition, he testified that he "knew [the victim] from the neighborhood" and
knew Jenkins because Jenkins previously resided at the apartment building.

## B. Clarence Morgan's Testimony

Morgan testified that on July 28, 2004, at 11 p.m., he was standing on the South Michigan Avenue side of Sanders's apartment building, drinking liquor with the victim, who was a friend of his, and with "other people," which included Richards and a man named David Parker. He testified that defendant, Jenkins, and a man known as "Chub" were standing "in front" of the apartment building. He testified that he had known defendant and Jenkins for approximately 10 years because, at one time, they both lived in the same apartment building as him.

Morgan testified that "Chub" handed a hooded sweatshirt to Jenkins and the victim then made a "smart comment" to "Chub." Morgan testified that the victim said to "Chub," "was he on bullshit," which he understood to mean, he was "up to no good at the time." Morgan testified that he did not hear the victim threaten defendant or Jenkins at any time on the night of the shooting. Morgan further testified that prior to the shooting he was unaware of any animosity between defendant, Jenkins, and the victim.

Morgan also testified that, after the victim made the comment to "Chub," he observed defendant and Jenkins walk in a westerly direction across South Michigan Avenue and through a gangway toward Wabash. He testified that the victim followed them into the gangway, but then he lost sight of the victim. He testified that he did not observe a handgun on the victim. Morgan testified that, approximately one minute later, he heard five gunshots coming from the direction of the gangway. When the victim did not return, Morgan decided to walk to Wabash to determine if the victim had arrived at the other side of the gangway. He testified that he walked south to 63rd Street then west to Wabash to avoid walking through the gangway. When he arrived at the corner of 63rd Street and Wabash, he observed the victim lying on the ground in the gangway. He also observed several people, including Richards and Parker, standing near the victim's body, but he did not observe defendant or Jenkins in the area.

On cross-examination, Morgan testified that defendant, Jenkins, and "Chub" were members of the "Insane Gangster Disciples" gang, while he was a member of the "Black Gangster Disciples," a rival gang. He testified that his gang "controlled" Sanders's apartment building, but after a series of arrests of Black Gangster Disciple members, defendant and Jenkins started "hanging around" the apartment building. He further testified that the victim had a confrontation with defendant, Jenkins, and "Chub" two weeks before the shooting because they were trying to take over the drug sales at the building.

## C. David Parker's Testimony

Parker testified that he was a friend of the victim and that Jenkins had a "beef" with the victim because the victim had been discussing Jenkins and Jenkins's "parent" in the presence of others. He testified that two days before the shooting, defendant asked Parker to tell the victim to stop talking about Jenkins.

-4-

¶ 16        Parker testified that at 11 p.m. on the evening of July 28, 2004, he was visiting with the victim, Richards, Morgan, and a man by the name of Keith Wright. He testified that they were drinking liquor and standing on the South Michigan Avenue side of Sanders's apartment building. He testified that defendant, Jenkins and "Chub" walked passed them. Parker observed "Chub" remove his hooded sweatshirt and hand it to Jenkins. Parker testified that he thought it was unusual for a person to wear a hooded sweatshirt because the evening was "cool, but it wasn't cool enough for a [hooded sweatshirt]." Parker denied that he heard the victim say anything to defendant, Jenkins or "Chub" at that time.

¶ 17        Parker testified that two people began arguing across the street from the apartment building, and he walked toward the couple to stop the argument. He testified that he then heard seven gunshots and observed the gangway "lighting up from sparks." Parker testified that he noticed that the victim was no longer in the area and Morgan told him that "I think [the victim] just followed [defendant] and [Jenkins] to the gas station." Parker testified that he told the group that they should run to 63rd and Wabash to find out if anyone had been shot. He testified that when they arrived at Wabash, he observed the victim on the ground in the gangway. Parker testified that he and Morgan then ran to the victim's residence to inform his family of the shooting. He testified that he did not observe a gun on the victim that evening. Parker testified that Richards searched the victim's pockets to ensure there were no drugs on the victim.

¶ 18                    D. Chicago Police Detective Mike Qualls's Testimony

¶ 19        Detective Qualls testified that when he arrived at the scene at approximately 12:30 a.m., he did not locate a weapon near the body. He testified that he spoke with Parker the following day, who told him that just before he heard the gunshots, he heard the victim ask Jenkins, "What you all bitches doing with those hoodies?" He testified that after he and other officers interviewed witnesses, an investigative alert was issued for defendant, Jenkins, and "Chub." Detective Qualls testified that he and other detectives were initially unable to locate the three men.

¶ 20                    E. Stacey Daniels's Testimony

¶ 21        Daniels testified that he had been a friend of defendant's for more than four years. He testified that two weeks after the shooting, on August 12, 2004, he was with defendant at a mutual friend's home when defendant told Daniels that he "got into some problems" and that he was in "some serious shit." Daniels testified that defendant did not immediately explain this remark. Daniels, defendant and Jenkins then departed from their friend's home and walked to Daniels's apartment, which he shared with a man named Xavier Woolard. Daniels testified that when they arrived at his apartment, Woolard was in the apartment along with his girlfriend, named LaKiesha.

¶ 22        Daniels testified that he was standing on a rear porch of his apartment with defendant and

Jenkins when defendant explained to him that he "got into it with some dude," that there was a shooting, and that he "had to give it to [the] n***er." According to Daniels, defendant explained that he was walking through a gangway and observed that the "dude was following him." He told Daniels that he "didn't know what dude had or something and he thought dude was fittin' to do something to him" and that defendant said that he "turned around busting," which Daniels understood to mean shooting. Daniels testified that defendant then told him he needed to obtain money to leave town and that he might try to "hit a lick or something like that," which Daniels understood to mean "come up on some money" or to commit a robbery.

¶ 23    After his conversation with defendant, Daniels testified that he went to a party with Woolard, while defendant, Jenkins, and LaKeisha stayed at Daniels's and Woolard's apartment. Woolard was arrested at the party for an unrelated battery offense and Daniels then returned to his apartment.

¶ 24                    F. Chicago Police Officer Andre Bedford's Testimony

¶ 25    Officer Bedford testified that he arrested Woolard at the party. Following the arrest, Woolard told him that there were two people, nicknamed "Little Joe and Ced," who were at his apartment and were wanted on murder charges. Woolard then consented to a search of his apartment. Officer Bedford performed a police computer search of the nicknames and discovered that "Little Joe" was a nickname for defendant and that "Ced" was a nickname for Jenkins. Officer Bedford observed that there was an investigative alert for defendant and Jenkins in relation to the July 28 shooting.

¶ 26    Officer Bedford testified that, at 5 a.m. the following day, he and two other police officers conducted a search of Daniels's and Woolard's apartment, where they found four individuals, defendant, Jenkins, Daniels and LaKeisha. During the search, the officers found a 9-millimeter Glock brand handgun, loaded with two bullets, and an additional 28 bullets in Woolard's bedroom. The officers also searched defendant, who had one Wolf brand Luger bullet and four "hollow point" Luger bullets in his pocket; and Jenkins, who had a 9-millimeter High Point handgun, loaded with seven bullets, on his person.

¶ 27                    G. Forensic Investigator Kaput's Testimony

¶ 28    Forensic investigator Kaput testified that he arrived at the crime scene at approximately 10 minutes after midnight on July 29, 2004. He testified that he conducted a walk-through of the crime scene, where he found five fired Wolf brand 9-millimeter Luger cartridge casings and a 9-millimeter fired bullet. Kaput placed the cartridge casings and fired bullet into individual envelopes and submitted the envelopes to the Illinois State Police crime lab.

¶ 29                        H. Assistant Cook County Medical Examiner

                             Dr. Valerie Arangelovich's Testimony

¶ 30      Dr. Arangelovich testified that she performed an autopsy on the victim. She observed that the victim had seven bullet entrance wounds and five exit wounds. She recovered two bullets from the victim's body and a third bullet "hanging loose in his clothes." Dr. Arangelovich placed the bullets into individual envelopes and submitted the envelopes to the Illinois State Police crime lab. She concluded that the victim died from multiple gunshot wounds.


¶ 31                                    I. Stipulations

¶ 32      The parties stipulated that four of the five fired cartridge casings Kaput found at the crime scene were fired from the same handgun, but not by either the Glock handgun that was found in Woolard's bedroom, or the High Point handgun, which was found on Jenkins, during the search of Woolard's apartment. However, the fifth fired cartridge casing found at the crime scene was fired from the Glock handgun.

¶ 33      The parties further stipulated to the following: (1) the fired bullet found at the crime scene by Kaput was not fired by the High Point handgun, but the forensic test on the bullet was inconclusive as to whether the bullet was fired from the Glock handgun; (2) the three bullets recovered by Dr. Arangelovich were fired from the same handgun, but not from the Glock or High Point handgun; and (3) the fired bullet recovered by Kaput from the crime scene was not fired by the same handgun as the three bullets recovered by Dr. Arangelovich from the victim's body and clothes.

¶ 34      After the State rested, defense counsel moved for a directed verdict, which was denied. During a recess before defense counsel presented the defense, the following colloquy took place:

          "THE COURT: [Defendant], your attorney informed me that he has your co-defendant, [Jenkins], present. And he is available. He has been interviewed. Based on that interview, your attorney has decided that he thinks it is to your best interest not to call this witness. He also explained to me [that] he discussed that with you. Is that correct?

          DEFENDANT: Yes, sir.

          THE COURT: Do you agree with that?

          DEFENDANT: Yes, sir."

¶ 35      The defense did not call Jenkins as a witness, and defendant did not testify on his own behalf. Defense counsel called one witness, Sergeant Cherry[3], who testified that he responded to the crime scene at midnight on July 28, 2004. He testified that when he arrived at the

_____

[3]Sergeant Cherry's first name does not appear in the record.

scene two men flagged him down. He observed two other men kneeling next to the victim and that approximately 60 other people were in the area near the victim. He testified that he asked several people, including Richards, to stay to speak with detectives. He testified that when the detectives arrived, Richards had left the area.

¶ 36    As noted, the jury found defendant guilty of first-degree murder. The trial court sentenced defendant to 30 years in the Illinois Department of Corrections plus 25 years for personally discharging a firearm. Defendant appealed his conviction, which did not include a claim of ineffective assistance of counsel. Defendant's conviction was affirmed on direct appeal.

¶ 37                    J. Defendant's *Pro Se* Postconviction Petition

¶ 38    On June 16, 2009, defendant filed a *pro se* petition for postconviction relief, in which he argued, *inter alia*, that his trial counsel was ineffective for failing to present the exculpatory testimony of Jenkins, which would have fulfilled a promise made to the jury in defense counsel's opening statements that Jenkins would "tell [them] what happened inside that gangway." Defendant also claims that appellate counsel was ineffective for not raising the issue on direct appeal.

¶ 39    In support of his petition, defendant attached a signed affidavit from Jenkins. Above Jenkins's signature is written: "Pursuant to *** 735 ILCS 5/1-109, I declare, under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief." The affidavit is not notarized. In his petition, defendant alleged that Jenkins's affidavit is "not notarized [because the] Menard Correctional Center law library refused to do so."

¶ 40    Jenkins stated in his affidavit that he was willing to testify at defendant's trial and that he would have testified that the victim followed him and defendant into the gangway and then said to them, "G.K.D. yall some bitches" with his hand in his pocket. Jenkins stated that he told the victim to "go about his business," and turned to "catch up" with defendant. He stated that the victim continued to follow them and that the victim was "talking crazy with his hand in his pocket."

¶ 41    Jenkins stated that he turned around "a second time" and told the victim "to go about his business." Jenkins stated that the victim then "acted like he was about to pull a gun out of his pocket." Jenkins stated that he then "pulled out" a handgun and shot at the victim once. He stated that defendant did not know that he was armed and fled when he heard the shot. Jenkins stated that he shot the victim two more times and then his handgun jammed. He then "pulled out" a second handgun and fired four more shots at the victim. Jenkins stated that he was arrested with one of the handguns that he used in the shooting and that he told police he had discarded the second handgun. He also stated that he told an arresting police officer that he alone shot the victim.

¶ 42    A hearing was held on defendant's petition. On September 10, 2009, the trial court dismissed defendant's postconviction petition in a written order, finding that: (1) the issues

raised in the petition were also raised on direct appeal and therefore barred by the doctrine of *res judicata*; (2) defendant's allegations were conclusory and defendant's petition lacked required supporting documents "such as affidavit or other sworn statements"; and (3) defendant's petition was frivolous and patently without merit.

¶ 43    This appeal follows.

¶ 44                                    II. ANALYSIS

¶ 45    Although defendant's postconviction petition raises 15 claims of ineffective assistance of trial and appellate counsel, we consider only those claims that defendant has raised in this appeal. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 46    On appeal, defendant claims that the trial court erred in dismissing his postconviction petition at the first stage because: (1) he raised the "non-frivolous constitutional claim[s]" that trial counsel was ineffective for "making an unfulfilled promise to the jury to present exonerating testimony of co-defendant Jenkins," and that appellate counsel was ineffective for failing to raise this issue on direct appeal; and (2) the trial court "overlook[ed] Jenkins's affidavit," which supported defendant's petition.

¶ 47                               A. Standard of Review

¶ 48    A trial court's dismissal of a postconviction petition at the first stage is reviewed *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Torres*, 228 Ill. 2d 382, 394 (2008); *People v. Edwards*, 197 Ill. 2d 239, 247 (2001); *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998). "A *de novo* review entails performing the same analysis a trial court would perform"; in other words, we accept all well-pleaded facts in the complaint as true while disregarding legal or factual conclusions unsupported by allegations of fact. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 49                            B. Post-Conviction Hearing Act

¶ 50    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2008)) provides that a defendant may challenge his or her conviction or sentence for violations of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)). In a postconviction proceeding, a petitioner is not entitled to an evidentiary hearing as a matter of right. *People v. Simms*, 192 Ill. 2d 348, 359 (2000). To be entitled to postconviction relief, a defendant bears the burden of showing that he or she suffered a substantial deprivation of his or her federal or state constitutional rights in the proceedings. 725 ILCS 5/122-1(a) (West 2008); *Pendleton*, 223 Ill. 2d at 471 (citing *Whitfield*, 217 Ill. 2d at 183); *People v. Evans*, 186 Ill. 2d 83, 89 (1999); *People v. Lacy*, 407 Ill. App. 3d 442, 455 (2010).

¶ 51    1. A Summary Dismissal Is Proper When Barred by *Res Judicata* or Forfeiture

¶ 52    A proceeding under the Act is a collateral proceeding, not an appeal from the underlying judgment. *People v. Coleman*, 206 Ill. 2d 261, 277 (2002) (citing *People v. Williams*, 186 Ill. 2d 55, 62 (1999)); *Evans*, 186 Ill. 2d at 89. The purpose of the proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *Whitfield*, 217 Ill. 2d at 183; *Coleman*, 206 Ill. 2d at 277. Thus, all issues decided on direct appeal are barred by the doctrine of *res judicata*, and all issues that could have been raised in the original proceeding, but were not, are procedurally forfeited. *People v. Taylor*, 237 Ill. 2d 356, 372 (2010).

¶ 53    2. A Summary Dismissal Is Proper When a Petition

Violates Section 122-2 of the Act

¶ 54    The petition cannot consist of nonfactual and nonspecific assertions that merely amount to conclusions that errors occurred at trial. *People v. Simms*, 192 Ill. 2d 348, 359 (2000) (citing *People v. Kitchen*, 189 Ill. 2d 424, 433 (1999)). Rather, a petition filed under the Act must "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2008).

¶ 55    While a *pro se* postconviction petition is not expected to set forth a complete and detailed factual recitation, the petition " 'must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent.' " *Hodges*, 234 Ill. 2d at 10 (quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008)); 725 ILCS 5/122-2 (West 2008) (a petition must have attached "affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached"). The purpose of the "affidavits, records, or other evidence" requirement in section 122-2 of the Act (725 ILCS 5/122-2 (West 2008)) is to establish that a petition's allegations are capable of " 'objective or independent corroboration.' " *Delton*, 227 Ill. 2d at 254 (quoting *People v. Hall*, 217 Ill. 2d 324, 333 (2005), citing *People v. Collins*, 202 Ill. 2d 59, 67 (2002)). Thus, a trial court may summarily dismiss a petition if the defendant fails to attach the required "affidavits, records, or other evidence" or fails to explain their absence from his or her postconviction petition. *Delton*, 227 Ill. 2d at 255 ("failure to either attach the necessary 'affidavits, records, or other evidence' or explain their absence is 'fatal' to a post-conviction petition [citation] and by itself justifies the petition's summary dismissal" (internal quotation marks omitted) (quoting *Collins*, 202 Ill. 2d at 66, citing *People v. Coleman*, 183 Ill. 2d 366, 380 (1998), quoting *People v. Jennings*, 411 Ill. 21, 26 (1952))).

¶ 56    3. Three Stage Process for Adjudicating a Postconviction Petition

¶ 57    In noncapital cases, the Act provides a three-stage process for adjudicating a petition for postconviction relief. 725 ILCS 5/122-1 *et seq*. (West 2008); *Pendleton*, 223 Ill. 2d at 471-72. At the first stage, the trial court examines the petition independently and without any

further pleadings from the defendant or any motions or responsive pleadings from the State. *People v. Brown*, 236 Ill. 2d 175, 184 (2010) (citing *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). The allegations in the petition, taken as true and liberally construed, need to present the " 'gist of a constitutional claim.' " *Delton*, 227 Ill. 2d at 254 (quoting *Gaultney*, 174 Ill. 2d at 418); *People v. Porter*, 122 Ill. 2d 64, 74 (1988) (in order to avoid dismissal, defendant need only present the "gist" of a constitutional claim that would provide relief under the Act). This "gist" standard is a low threshold which requires the defendant to present only a limited amount of detail, not the claim in its entirety or legal argument or citation to legal authority. *Hodges*, 234 Ill. 2d at 9 ("[b]ecause most petitions are drafted at this stage by defendants with little legal knowledge or training, this court views the threshold for survival as low").

¶ 58     In considering the petition at the first stage, the trial court may examine "the trial record, the court file of the proceeding in which the defendant was convicted, any action taken by an appellate court in such a proceeding, any transcripts of such proceedings, and affidavits or records attached to the petition." *People v. Diehl*, 335 Ill. App. 3d 693, 700 (2002) (citing 725 ILCS 5/122-2.1(c) (West 1998)). The trial court may summarily dismiss the petition if the allegations in the petition are positively rebutted in the record. See *Coleman*, 183 Ill. 2d at 381-82 ("this court has consistently upheld the dismissal of a post-conviction petition when the allegations are contradicted by the record from the original trial proceedings" (citing *People v. Gaines*, 105 Ill. 2d 79, 91-92 (1984), and *People v. Arbuckle*, 42 Ill. 2d 177, 182 (1969)); see, *e.g.*, *People v. Williams*, 364 Ill. App. 3d 1017, 1025 (2006) (concluding that defendant failed to state the gist of a constitutional claim that he was unfit to plead guilty when the record "clearly show[ed] that defendant understood the nature and purpose of the proceedings," informed the trial court that he understood the charges against him, did not exhibit "irrational" behavior in court, and actively participated in the proceedings and conferred with trial counsel).

¶ 59             4. A Summary Dismissal Is Proper When Petition Is Considered

"Frivolous or Patently Without Merit"

¶ 60     The trial court must dismiss the petition in a written order if the court finds that the petition is "frivolous or *** patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2008). Neither "frivolous" nor "patently without merit" is defined in the Act. However, the Illinois Supreme Court has held that a postconviction petition is considered frivolous or patently without merit only if it "has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 16. A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. A claim completely contradicted by the record is an example of an indisputably meritless legal theory. *Hodges*, 234 Ill. 2d at 16. Fanciful factual allegations include those that are fantastic or delusional. *Hodges*, 234 Ill. 2d at 17.

¶ 61     If the trial court does not dismiss the petition as frivolous or patently without merit, then the petition advances to the second stage. If the petition advances to the second stage, the

trial court may appoint counsel for an indigent defendant and counsel will have an opportunity to amend the petition. 725 ILCS 5/122-4 (West 2008). The State can file a motion to dismiss or an answer to the petition and the trial court must then determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. 725 ILCS 5/122-5 (West 2008); *Edwards*, 197 Ill. 2d at 246 (citing *Coleman*, 183 Ill. 2d at 381). If no such showing is made, the petition is dismissed. If, however, a substantial showing of a constitutional violation is made, the petition is advanced to the third stage, where the trial court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2008); *Edwards*, 197 Ill. 2d at 246.

¶ 62    In the case at bar, the trial court dismissed defendant's postconviction petition at the first stage and provided in its written order three reasons for the dismissal: (1) the issues raised in the petition were also raised on direct appeal and therefore barred by the doctrine of *res judicata*; (2) defendant's allegations were conclusory and defendant's petition lacked required supporting documents such as affidavits or other sworn statements as required under section 122-2 of the Act; and (3) defendant's petition was frivolous and patently without merit. However, the trial court did not specify which issues were dismissed for which reason. Thus, we consider each of the trial court's reasons as it applies to defendant's claims on appeal.

¶ 63              C. Whether Defendant's Claims Are Barred by Res Judicata

¶ 64    First, defendant claims that the trial court erred in summarily dismissing his postconviction petition when it found that the issues raised in the petition were barred by *res judicata*.

¶ 65    In the context of a postconviction petition, *res judicata* bars consideration of claims that were previously raised and decided on direct appeal. *People v. Blair*, 215 Ill. 2d 427, 443 (2005). Defendant's claims of ineffective assistance of counsel were not raised on direct appeal and, thus, cannot be barred by *res judicata*. Accordingly, *res judicata* does not bar consideration of defendant's claims of ineffective assistance of trial and appellate counsel.

¶ 66              D. Whether Defendant's Petition "Lacked Supporting Documents"

¶ 67    Second, defendant claims that the trial court erred in finding that the petition "lack[ed] supporting documentation." The pleading requirements of the Act are found in section 122-2 (see *Hodges*, 234 Ill. 2d at 9), which requires that the petition "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2008). Section 122-2 also requires that "[t]he petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2008). As noted, defendant attached Jenkins's affidavit, which was signed but not notarized.

¶ 68    The State argues that although defendant attached Jenkins's affidavit to the petition, the

affidavit is not valid because it is not notarized. Thus, the State concludes, the trial court was not required to consider Jenkins's affidavit and the court properly dismissed defendant's postconviction petition because it lacked supporting documentation. We disagree.

¶ 69    To be considered a valid affidavit, our supreme court has held that an affidavit must be notarized unless otherwise provided for by a specific supreme court rule or statutory authorization. See *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 496 (2002). In *Roth*, our supreme court explained that " '[a]n affidavit is simply a declaration, on oath, in writing, sworn to *** before some person who has authority under the law to administer oaths.' " *Roth*, 202 Ill. 2d at 493 (quoting *Harris v. Lester*, 80 Ill. 307, 311 (1875)). Thus, the supreme court concluded, statements in writing that have not been sworn to before an authorized person cannot be considered as affidavits. *Roth*, 202 Ill. 2d at 494.

¶ 70    In determining the validity of Jenkins's proposed affidavit, we find instructive a case from the Second District of the Appellate Court, *People v. Niezgoda*, 337 Ill. App. 3d 593 (2003). In *Niezgoda*, the defendant filed a *pro se* postconviction petition alleging ineffective assistance of counsel and attached his own affidavit and section 122-2 supporting affidavits from three other potential witnesses. *Niezgoda*, 337 Ill. App. 3d at 595. None of the affidavits were notarized. *Niezgoda*, 337 Ill. App. 3d at 595. The Second District, following *Roth*, found that affidavits filed pursuant to the Act must be notarized to be valid. *Niezgoda*, 337 Ill. App. 3d at 597. The *Niezgoda* court then found that "the affidavits the defendant filed had no legal effect" because the affidavits were not notarized or sworn before a person who had the authority to administer oaths, and, as a result, the trial court properly dismissed the petition. *Niezgoda*, 337 Ill. App. 3d at 597 (citing *People v. Johnson*, 183 Ill. 2d 176, 191 (1998)).

¶ 71    Here, similar to the defendant's petition in *Niezgoda*, Jenkins's affidavit is not notarized and, thus, not a valid affidavit on its face. However, in *Niezgoda*, the defendant appealed from a second-stage dismissal of his petition. To support a claim of failure to present a witness, a defendant must tender a valid affidavit from the individual who would have testified. *People v. Enis*, 194 Ill. 2d 361, 380 (2000) (citing *People v. Johnson*, 183 Ill. 2d 176, 192 (1998), and *People v. Thompkins*, 161 Ill. 2d 148, 163 (1994)). Without a valid affidavit, a reviewing court cannot determine whether the proposed witness could have provided information or testimony favorable to the defendant. *Johnson*, 183 Ill. 2d at 192 (citing *People v. Guest*, 166 Ill. 2d 381, 402 (1995), and *People v. Ashford*, 121 Ill. 2d 55, 77 (1988)). After this case was initially filed, the Second District decided *People v. Carr*, 407 Ill. App. 3d 513 (2011). In *Carr*, the defendant appealed from the summary dismissal of his *pro se* postconviction petition at the first stage. *Carr*, 407 Ill. App. 3d at 515. Relying on *Niezgoda*, the Second District held that because the defendant's section 122-1 affidavit was not notarized, it was not valid. *Carr*, 407 Ill. App. 3d at 515. The court also declined to distinguish affidavits filed pursuant to section 122-1 from the section 122-2 affidavit at issue in *Niezgoda* because *Niezgoda* held that the notarization requirement for affidavits applies to the entire Act. *Carr*, 407 Ill. App. 3d at 515. Accordingly, the court did not consider the differing purposes of the two affidavit requirements. The court found that because the defendant's section 122-1 affidavit was not notarized, it was not valid and he was not entitled

to relief. *Carr*, 407 Ill. App. 3d at 516.

¶ 72　　　　Recently, in *People v. Henderson*, 2011 IL App (1st) 090923, Justice Lavin authored an opinion analyzing the case based on a defendant's failure to obtain notarization of a verifying affidavit where defendant was imprisoned and there was no guarantee that a defendant would be afforded the services of a notary public. *Henderson*, 2011 IL App (1st) 090923, ¶ 36. The court in *Henderson* found that "the purposes of the Act and section 122-2.1 would be hindered by preventing petitions which are neither frivolous nor patently without merit from proceeding to the second stage due to the technicality at issue." *Henderson*, 2011 IL App (1st), 090923, ¶ 35. The *Henderson* court further found that "[a]t the second stage, the State will have the opportunity to object to the lack of notarization" and that "appointed counsel can assist in arranging for the notarization of the verification affidavit." *Henderson*, 2011 IL App (1st), 090923, ¶ 35. *Henderson* declined to follow *Carr* as we do.

¶ 73　　　　　　E. Whether Defendant's Petition Is Frivolous and Patently Without Merit

¶ 74　　　　Third, defendant claims that the trial court erred when it summarily dismissed his petition as frivolous and patently without merit. Specifically, defendant argues that he presented a non-frivolous constitutional claim that his trial counsel was ineffective for failing to fulfill his promise to the jury to present Jenkins's exculpatory testimony and that appellate counsel was ineffective for failing to raise the issue on appeal.

¶ 75　　　　A defendant has a sixth amendment right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which the Illinois Supreme Court adopted in *People v. Albanese*, 102 Ill. 2d 54 (1984).

¶ 76　　　　Under *Strickland*, a defendant must prove both that: (1) his attorney's actions or inactions constituted error(s) so serious as to fall below an objective standard of reasonableness "under prevailing professional norms" (*People v. Colon*, 225 Ill. 2d 125, 135 (2007); *People v. Evans*, 209 Ill. 2d 194, 220 (2004)); and (2) defense counsel's deficient performance prejudiced the defendant. *People v. Hodges*, 234 Ill. 2d at 17 (citing *Strickland*, 466 U.S. at 687-88). "At the first stage of postconviction proceedings under the Act, a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17. The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *People v. Patterson*, 192 Ill. 2d 93, 107 (2000).

¶ 77　　　　Ineffective assistance of appellate counsel is determined under the same standard as a claim of ineffective assistance of trial counsel. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001) (citing *People v. West*, 187 Ill. 2d 418, 435 (1999)). Appellate counsel is not required

to raise every conceivable issue on appeal, and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit. *Edwards*, 195 Ill. 2d at 163-64 (citing *People v. Johnson*, 154 Ill. 2d 227, 236 (1993)). Accordingly, unless the underlying issue has merit, there is no prejudice from appellate counsel's failure to raise an issue on appeal. *Edwards*, 195 Ill. 2d at 164 (citing *People v. Childress*, 191 Ill. 2d 168, 175 (2000)).

¶ 78    Defendant claims that it is arguable that trial counsel's performance fell below an objective standard of reasonableness because counsel promised the jury during his opening statement that Jenkins would provide exculpatory testimony on defendant's behalf, and then failed to provide the promised testimony during trial.

¶ 79    A defendant is entitled to reasonable, not perfect, representation. *People v. Fuller*, 205 Ill. 2d 308, 330 (2002) (citing *People v. Palmer*, 162 Ill. 2d 465, 476 (1994)); *West*, 187 Ill. 2d at 432 (citing *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. *People v. Munson*, 206 Ill. 2d 104, 139-40 (2002); *West*, 187 Ill. 2d at 432 (citing *People v. Ramey*, 152 Ill. 2d 41, 53-55 (1992)). It is well established that these types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel. *People v. Smith*, 195 Ill. 2d 179, 188 (2000); *West*, 187 Ill. 2d at 432. "In recognition of the variety of factors that go into any determination of trial strategy, *** claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), and *Strickland*, 466 U.S. at 689). Thus, "[m]istakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent." (Internal quotation marks omitted.) *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988).

¶ 80    A defense counsel's failure to provide testimony promised during opening statements is not ineffective assistance of counsel *per se*. *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002). We agree with defendant that counsel's assistance may be ineffective if he or she promises that a particular witness will testify during opening statements, but does not provide the promised testimony during trial. See generally *People v. Briones*, 352 Ill. App. 3d 913 (2009). However, we have also recognized that counsel's decision to abandon a trial strategy during trial may be reasonable under the circumstances and that the decision not to provide promised testimony may be warranted by unexpected events. *People v. Ligon*, 365 Ill. App. 3d 109, 120 (2006). In either case, a defendant must overcome a strong presumption that the challenged action or inaction of defense counsel may have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93; *People v. Coleman*, 183 Ill. 2d 366, 397 (1998); *People v. Griffin*, 178 Ill. 2d 65, 73-74 (1997); see also *People v. Gacy*, 125 Ill. 2d 117, 126 (1988) ("The burden of *** overcoming the presumption that an attorney's decision is the product of 'sound trial strategy' rests upon the defendant ***.").

¶ 81    A defendant may overcome the strong presumption that defense counsel's choice of strategy was "*sound* if counsel's decision appears so irrational and unreasonable that no

reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." (Emphasis in original.) *People v. King*, 316 Ill. App. 3d 901, 916 (2000) (citing *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997)). "[Sound trial strategy] embraces the use of established rules of evidence and procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts." *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996).

¶ 82    Here, we cannot say that defense counsel's decision not to call Jenkins as a witness was outside the realm of sound trial strategy. The record shows that defense counsel contemplated calling Jenkins as a witness. However, after interviewing him, defense counsel determined that Jenkins's testimony would not be in defendant's "best interest." Defense counsel then informed defendant and the trial judge of his decision not to call Jenkins as a witness. The trial court discussed the matter with defendant and his counsel in open court and defendant informed the court that he agreed with his counsel's decision. Based on the record, defense counsel's decision to not call Jenkins as a witness appears to be the product of sound trial strategy, a strategy that the defendant agreed with. See *People v. Flores*, 128 Ill. 2d 66, 106 (1989) ("defense counsel need not call a witness if he reasonably believes that under the circumstances the individual's testimony is unreliable or would likely have been harmful to the defendant").

¶ 83    Considering Jenkins' affidavit in addition to the record, we still conclude that defendant did not overcome the strong presumption that defense counsel's decision was the product of sound trial strategy at the time that he interviewed Jenkins.

¶ 84    The record also shows that two of the State's witnesses, Morgan and Parker, testified that there was animosity between defendant and Jenkins and the victim, which supported the defense counsel's self-defense theory. Specifically, Morgan testified that the victim was in a gang rival to defendant's and Jenkins's gang. He further testified that the victim had a confrontation with defendant and Jenkins two weeks prior to the shooting. Parker testified that the victim had a "beef" with Jenkins. Both Morgan and Parker testified that the victim pursued defendant and Jenkins as they were walking into the gangway. Jenkins's purported testimony now, as stated in his affidavit, would have not supported defendant's theory that he acted in self-defense. According to Jenkins's affidavit, Jenkins would have testified that defendant had nothing to do with the shooting and that he alone shot the victim. This was not the theory that was presented by the defense at trial.

¶ 85    Moreover, Jenkins was a codefendant and his testimony may have been harmful to defendant. The chance of such harm is even more likely considering that defendant successfully moved for severed trials on the grounds that Jenkins had made statements which, if introduced at trial, would be prejudicial to defendant. In *People v. Ashford*, 121 Ill. 2d 55, 75 (1988), our supreme court rejected the defendant's postconviction petition claim that his counsel was ineffective for not subpoenaing his codefendant to testify. The supreme court found that subpoenaing his codefendant

    "would surely have been an incomprehensible, if not utterly egregious, trial tactic ***. Having successfully moved for severed trials on the ground that [his codefendant] had

-16-

made statements which, if introduced at trial, would be prejudicial to him, we cannot understand how the defendant can now fault counsel for failing to subpoena [his codefendant]." *Ashford*, 121 Ill. 2d at 75.

¶ 86    In his motion for severance, defendant alleged that Jenkins "has made written and/or oral statements implicating [him]." He further alleged that he believed that Jenkins's defense "is in conflict and antagonistic toward [him] and he cannot obtain a fair and impartial trial because of the prejudice created by the inconsistent, conflicting, and antagonistic defenses."

¶ 87    Accordingly, we cannot say that defense counsel's decision not to call Jenkins was so irrational or unreasonable that his performance fell below an objective standard of reasonableness when, before trial, defendant sought to sever Jenkins's trial from his own, and when, during trial, defense counsel determined after interviewing Jenkins that his testimony would not be in defendant's best interest.

¶ 88    We find the case at bar distinguishable from the cases defendant cites where defense counsel's performance was deficient for failing to fulfill his promise to the jury to present exculpatory testimony from witnesses. Defendant cites *People v. Bryant*, 391 Ill. App. 3d 228 (2009), and *People v. Briones*, 352 Ill. App. 3d 913 (2004).

¶ 89    In *Bryant*, the Fifth District found that defense counsel was ineffective in the defendants' joint murder case for failing to call any witnesses, who were available to testify at trial, in support of the defense theory proffered in opening statements to the jury that the murder was committed by others. *Bryant*, 391 Ill. App. 3d at 229. On review, the *Bryant* court found that defense counsel's performance was deficient because trial counsel attempted to present his defense entirely through cross-examination of the State's witnesses, but his questions were repeatedly and successfully challenged by "beyond the scope" objections from the State. *Bryant*, 391 Ill. App. 3d at 239. The court found that, although counsel's decision not to call any witnesses was a matter of trial strategy, said strategy was not reasonable, and the resulting prejudice was not harmless, as it "appears that counsel concluded that rather than support the defense theory with evidence that the jury might reject, it was better to not support the theory at all." *Bryant*, 391 Ill. App. 3d at 241.

¶ 90    In the case at bar, there is no indication in the record, and defendant does not argue, that defense counsel entirely failed to support his theory of self-defense similar to the defense counsel in *Bryant*. Rather, our examination of the record in this case shows that defense counsel's performance was not deficient because counsel exhibited an understanding of the fundamental rules of criminal procedure, subjected the State's witnesses to meaningful adversarial testing, and presented a trial strategy without flawed legal arguments. *People v. Schlager*, 247 Ill. App. 3d 921, 932 (1993).

¶ 91    In *Briones*, the Fifth District of the Appellate Court found that defense counsel's performance was deficient after counsel reneged on a promise to the jury during opening statements that the defendant would testify. *Briones*, 352 Ill. App. 3d at 919. During trial the defendant informed the trial court that he decided, after speaking to his trial counsel, that he would not testify on his own behalf. *Briones*, 352 Ill. App. 3d at 916. On appeal, defendant

claimed that his defense counsel's decision for him not to testify was unsound trial strategy and the appellate court agreed. *Briones*, 352 Ill. App. 3d at 918.

¶ 92     In deciding whether defense counsel's decision constituted deficient performance, the court recognized that it was trial counsel's "responsibility to evidence in the record that [her performance] was not deficient, *i.e.*, that the determination [that defendant would not testify] was a result of the defendant's fickleness or of counsel's sound trial strategy due to unexpected events." *Briones*, 352 Ill. App. 3d at 919. In its review, the court found that defense counsel "failed to show in the record that the defendant inexplicably changed his decision to testify or that, because of unexpected events, sound trial strategy required her to break her promise that the defendant would testify." *Briones*, 352 Ill. App. 3d at 919. As a result, the appellate court declined to presume that defense counsel's decision not to present the defendant's testimony, after promising to do so in opening statements, was the result of sound trial strategy and thus concluded that counsel's performance was deficient. *Briones*, 352 Ill. App. 3d at 919. See also *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999) (unable to determine "as a matter of law" whether defense counsel's decision to not call certain witnesses was a "professionally reasonable tactical decision" because the record did not reflect counsel's reasoning for the decision).

¶ 93     Here, unlike *Briones* and *Tate*, the record shows that defense counsel had a reason for not calling Jenkins to testify–he reasonably believed that, after interviewing Jenkins, the testimony Jenkins would provide would not be in defendant's best interest. Defense counsel interviewed Jenkins before presenting the testimony and, as a result of that interview, determined that his testimony would not be in the best interest of the defendant. Defense counsel then informed the trial court and defendant of his decision, and defendant informed the court that he agreed with his counsel's decision.

¶ 94     Defendant also argues that defense counsel's "failure to present Jenkins's exculpatory testimony to support defendant's otherwise uncorroborated defense amounts to ineffective representation." Defendant cites *People v. King*, 316 Ill. App. 3d 901 (2000), but we find that case also distinguishable to the case at bar.

¶ 95     In *King*, the defendant was convicted of aggravated criminal sexual assault and aggravated kidnaping for the abduction and rape of a 17-year-old passenger on the defendant's school bus route. *King*, 316 Ill. App. 3d at 903-04. Defendant maintained that he did not rape the passenger and was never alone with her on the bus. Defendant provided his defense counsel with the name of an alibi witness who worked as a bus attendant on defendant's bus and who was working on the bus on the day of the alleged rape. *King*, 316 Ill. App. 3d at 904. The defendant alleged that his trial counsel never interviewed the bus attendant in preparation for trial and never called her as a witness, although she was present at court and available to testify on the trial date. *King*, 316 Ill. App. 3d at 904. The bus attendant's affidavit stated that she was on the bus the entire time the students were riding home and that the 17-year-old passenger was never alone on the bus with the defendant. *King*, 316 Ill. App. 3d at 904.

¶ 96     This court held that defense counsel's performance was deficient because defense

counsel was aware of the alibi witness but failed to interview the witness at any time before or during trial and failed to provide an explanation for failing to call or even interview the exculpatory witness. *King*, 316 Ill. App. 3d at 916. We could not conceive of any sound trial strategy for failing to do so. *King*, 316 Ill. App. 3d at 916.

¶ 97    Here, on the other hand, defendant does not claim in his postconviction petition that defense counsel failed to interview Jenkins before trial commenced, nor did Jenkins state in his affidavit that defense counsel failed to interview him prior to trial. There is no dispute that defense counsel did interview Jenkins before presenting his defense. As a result of that interview, defense counsel presented defendant and the trial judge with a reason for deciding not to call Jenkins as a witness–namely, that after interviewing the witness during a recess, he determined that calling Jenkins was not in defendant's best interest.

¶ 98    Defendant further argues that defense counsel's performance was deficient for failing to interview Jenkins, a known witness, before opening statements. However, we do not find any factual support for this argument. Defendant does not allege in his postconviction petition that his defense counsel did not interview Jenkins before opening statements. Jenkins, in his affidavit, also did not allege that he was not interviewed before opening statements. We also do not find any indication in the record that Jenkins was not interviewed before opening statements. Normally witnesses are interviewed well in advance of trial. It is also possible for a witness to change his testimony from the time he or she was first interviewed to the time he or she is called as a witness. However, a codefendant in a criminal trial may not agree to an interview until his trial has been concluded. We do not know, nor does the petition state, when Jenkins was first interviewed or what attempts were made to interview Jenkins prior to trial.

¶ 99    The record shows that defendant's decision not to call Jenkins as a witness, even after promising to call him as a witness during opening statements, appears to be the product of sound trial strategy. Considering Jenkins's affidavit in addition to the record, we cannot say that defendant overcame the presumption that his defense counsel's decision not to call Jenkins was the product of reasonable trial strategy. Since we are unable to conclude that defense counsel's performance arguably fell below objective standards, defendant's claim of ineffective assistance of trial counsel and appellate counsel must fail. *Patterson*, 192 Ill. 2d at 107. Accordingly, we cannot say that the trial court's summary dismissal of defendant's postconviction petition as frivolous and patently without merit was not proper.

¶ 100                              III. CONCLUSION

¶ 101    We affirm the trial court's summary dismissal of defendant's *pro se* postconviction petition as frivolous and patently without merit.

¶ 102    Affirmed.

¶ 103 JUSTICE GARCIA, specially concurring:

¶ 104 I do not subscribe to the majority's rejection of *People v. Carr*, 407 Ill. App. 3d 513 (2011), which held that an unsigned affidavit is not valid, for being at odds with this court's decision in *People v Henderson*, 2011 IL App (1st) 090923. *Supra* ¶ 72. Specifically, I disagree with the implicit suggestion by the majority that because a first-stage postconviction petition should not necessarily be dismissed for lack of supporting documentation based on an unsworn "affidavit" from a postconviction defendant under *Henderson*, the same result should obtain when the unsworn "affidavit" purports to be from a codefendant on behalf of a postconviction defendant. I agree with the observation in *Henderson*, "We need not address the result in *Wilborn*, as that case did not present an issue identical to the one before us." *Henderson*, 2011 IL App (1st) 090923, ¶ 36.

¶ 105 In this case, the defendant offers the excuse that Jenkins's efforts to notarize his statement were rebuffed by the Illinois Department of Corrections. It is fair to say that the defendant's assertion cannot be based on his own knowledge. There may be another equally plausible reason for Jenkins's statement not being notarized. In any event, I am not persuaded that an unsigned "affidavit" from a postconviction petitioner and an unsigned "affidavit" from a purported witness should be treated alike.

¶ 106 However, I agree with the majority's conclusion that upon *de novo* review the postconviction petition, with its supporting documentation, meets the legal standard of frivolous and patently without merit to warrant dismissal at the first stage, which after all is the true holding of this case and is the same result we reached as to the postconviction petition we reviewed in *Henderson*.