# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Parker*, 2012 IL App (1st) 101809

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS PARKER, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-1809 |
| Filed | June 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The defendant's *pro se* postconviction petition asserting a claim of actual innocence based on newly discovered evidence, which was supported by his own affidavit and an unnotarized affidavit from a codefendant, was sufficient to withstand a first-stage dismissal and, therefore, the trial court's first-stage dismissal was reversed and the cause was remanded for second-stage consideration. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-21702 (02); the Hon. James B. Linn, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jessica A. Hunter, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Brian K. Hodes, and Sari London, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.

Justices Garcia and Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Dennis Parker was charged, along with five codefendants, in connection with the murder of Niquita Johnson which occurred on August 25, 1999. At the bench trial in 2004, the defense did not put on a case and the trial judge observed that the primary evidence against defendant was his videotaped statement. Defendant was convicted of first-degree murder, as well as the related charges of home invasion, arson and concealment of a homicidal death; and he was sentenced to 45 years for murder, 30 years for home invasion, 7 years for arson and 5 years for concealment of a homicidal death, with all sentences to run concurrently. On direct appeal, this court vacated his arson conviction, finding that the State had failed to prove that charge beyond a reasonable doubt. It also vacated several other counts under the one-act, one-crime principle, so that the mittimus reflected convictions for only one count of murder, one count of home invasion and one count of concealment of a homicidal death. *People v. Parker*, No. 1-05-2201 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 2    On April 14, 2010, defendant filed a *pro se* postconviction petition asserting two claims: (1) a fourth amendment violation; and (2) a claim of "actual innocence *** based on newly discovered evidence," supported by affidavit. The trial court summarily dismissed the petition, stating first that the fourth amendment claim was already decided on direct appeal and thus was barred on *res judicata* grounds. The trial court also stated, incorrectly, that defendant had raised "[n]o claims about actual innocence or anything of the sort." As a result, the trial court never ruled on defendant's actual innocence claim, and it does not appear that the trial court reviewed the supporting affidavit.

¶ 3    On this appeal, defendant pursues only his actual innocence claim, and the State does not pursue the ground of *res judicata*.

¶ 4    Instead the State argues that we may affirm on any basis found in the record and puts forth as its first argument a ground that was not relied on by the trial court. The State argues that we should affirm this first-stage dismissal because the supporting affidavit submitted by

defendant was not notarized. However, this court has rejected this argument twice before. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 72 (a trial court may not dismiss a petition at the first stage simply because a supporting affidavit lacks notarization); *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 36 ("an unnotarized verification affidavit is not an appropriate basis for first-stage dismissal of a petition").

¶ 5      Next, the State argues that a codefendant's exculpatory affidavit can never be considered newly discovered. However, our supreme court already dispensed with that argument in *People v. Molstad*, 101 Ill. 2d 128, 135 (1984), where it held that the codefendants' affidavits constituted "new evidence," although the codefendants were previously known to defendant, because "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." *Molstad*, 101 Ill. 2d at 135.

¶ 6      If believed, the supporting affidavit submitted by petitioner in this case is completely exculpatory. In the case at bar, there was no physical evidence or eyewitness testimony, and the primary evidence was a confession obtained from defendant, who was a high school student with no prior record, no juvenile adjudications, and no gang affiliation. For these reasons, we reverse and remand this petition for second-stage consideration.

¶ 7                               BACKGROUND

¶ 8      In 1999, when defendant was arrested for this offense, he was 18 years old, and a student at Orr Community Academy.

¶ 9      In sum, the State's evidence at trial established that the victim, Niquita Johnson, was murdered in her home and that her body was later discovered in the trunk of her vehicle. Defendant was indicted for her murder, along with five codefendants, one of whom was the victim's brother. The State's theory of the case was that the victim's brother wanted to kill the victim because she had taken money from him, that the brother and some of his friends stabbed and struck her and then disposed of her body in the trunk of her own vehicle. Other than defendant's confession, the State presented no evidence that defendant knew either the victim or her brother. Other than the motive attributed to the victim's brother, the State's evidence did not establish that defendant had an independent motive for wanting to kill the victim.

¶ 10      There was no physical evidence to connect defendant to the murder; no event witnesses testified; and the trial court, which decided defendant's guilt, stated that "[t]he primary evidence against [defendant] is the videotaped statement," which defendant gave after multiple interrogations and almost 15 hours in custody and after initially denying involvement. The State presented only three witnesses: the victim's boyfriend who identified the victim; and the two detectives who were in charge of the case and who obtained defendant's confession.

¶ 11      Defense counsel did not put on a defense case at trial, and defendant maintained his innocence at sentencing.

¶ 12                                    I. Pretrial Proceedings

¶ 13      On February 18, 2003, defense counsel filed both a motion to quash arrest and suppress evidence, and a separate motion to suppress statements. The trial court denied both motions.

¶ 14                                    A. Motion to Quash Arrest

¶ 15      Prior to trial, defendant moved to quash his arrest, which occurred at his mother's house, the day after the victim's body was found. The police did not obtain an arrest warrant. The defense sought to quash the arrest on the ground that the police lacked probable cause.

¶ 16      At the hearing, which began on November 6, 2003, the defense called Detective Mihajlov, who testifed, at first, that he was the one who had arrested defendant at his house:

> "DEFENSE COUNSEL: The gentleman at the end of the table, do you recognize him?
>
> DETECTIVE MIHAJLOV: Yes
>
> DEFENSE COUNSEL: And who is that?
>
> DETECTIVE MIHAJLOV: Dennis Parker.
>
> DEFENSE COUNSEL: Did you arrest him at his house?
>
> DETECTIVE MIHAJLOV: I did."

However, after extensive questioning, the detective finally admitted that, although he signed the arrest report as "the first arresting officer," he was not present for defendant's arrest:

> "DEFENSE COUNSEL: Were you present when Mr. Parker was arrested?
>
> DETECTIVE MIHAJLOV: I was in the area. Yes.
>
> DEFENSE COUNSEL: Where in the area were you?
>
> DETECTIVE MIHAJLOV: Area 4 Detective Division.
>
> DEFENSE COUNSEL: I am sorry. You were in Area 4 Headquarters–
>
> DETECTIVE MIHAJLOV: Correct.
>
> DEFENSE COUNSEL: –when Mr. Parker was arrested?
>
> DETECTIVE MIHAJLOV: Correct."

¶ 17      Detective Mihajlov also testified that, at approximately 5 a.m. on August 26, 1999, he questioned codefendant Smith, who admitted that he had participated in the murder. During the questioning, Smith also implicated someone with the first name of "Dennis" but Smith did not provide a last name or an address or any other identifying information for "Dennis."

¶ 18      During the hearing, the prosecutor then stipulated that Buford Smith did not provide, at any time, either a last name or an address for "Dennis."

¶ 19      Detective Mihajlov then testified: "I don't recall where the name Dennis Parker came from." However, at some point, the detective testified that he "had a name, Dennis Parker," and he entered this name in the computer and retrieved the address of 3310 West Crystal Avenue, where defendant was later arrested. The prosecutor then stipulated that this was a warrantless arrest, and the defense rested.

¶ 20      The State then called Detective Robert Fujara, who testified that, on August 25, 1999,

he was informed that the victim's body had been found in the trunk of a vehicle near 3531 West Governor's Parkway. After he arrived, he observed the body in the trunk and that the vehicle and the body inside it had been burned. He learned that the vehicle was registered to the victim, Niquita Johnson, who had resided at 722 North Central Park Avenue. After the detective arrived at the victim's address, he spoke with codefendant Murry Over, who was also the victim's brother. The detective showed codefendant Over a Polaroid photograph of the victim's body and Over identified the victim as his sister.

¶ 21    Detective Fujara described the building where the victim lived as "a two flat with a basement apartment." While outside, the detective observed blood spatterings on the sidewalk in the rear of the building and more drops of blood on "the stairway porch leading into the building." After entering the victim's first-floor apartment, Detective Fujara observed that the sheets on her bed were "tucked in." When he lifted the sheets, he observed "a wet spot in the middle of the bed like something had been cleaned up."

¶ 22    Detective Fujara testified that, later that same day, he questioned codefendant Over at Area 4 headquarters. During the questioning, Over implicated himself, as well as codefendants Lloyd Satterfield and Buford Smith; and a man with the first name of "Dennis." Over stated that the motive for the murder was that he had not received anything from a $181,000 inheritance.

¶ 23    The prosecutor then stipulated that there was "nothing" in the police reports to even "suggest" that Over provided a last name for "Dennis." The prosecutor also stipulated that Over did not provide an address for "Dennis." The hearing was then adjourned for over a month.

¶ 24    Next, on December 17, 2003, the State called Detective Michael Duffin, who testified that on August 25, 1999, he was present at Area 4 headquarters and that codefendants Buford Smith and Murry Over were already in custody. Duffin testified that both Smith and Over identified a man named "Dennis" as a participant in the offense, but neither of them could provide any identifying information for "Dennis." However, Duffin testified that "Murry Over had told us that a juvenile–he [Over] had given us the name of a juvenile and the location of where this juvenile could be found who knew Dennis and could provide us Dennis' last name and address and more information on Dennis." Over did not describe the juvenile as a participant in or an eyewitness to the murder, or as anyone with firsthand knowledge of the murder or its participants.

¶ 25    Detective Duffin could not recall "who that juvenile was," or his last name, or where Duffin questioned him, or whether anyone else was present during the questioning. However, Detective Duffin testified that the juvenile stated that "Dennis" lived on Spaulding Avenue and attended Orr High School. The juvenile, who was a male, did not state that he (the juvenile) was a participant in or an eyewitness to the murder; and he did not indicate that he had any firsthand or personal knowledge of the murder or who had committed it.

¶ 26    Detective Duffin testified that the juvenile provided a telephone number for "Dennis," but the detective could not testify what that telephone number was. He testified that there were two telephone numbers in his notes of the interview written near the name "Dennis," but he could not swear that either one was the number. Detective Duffin testified that "[w]e

ran a check on the telephone number that the juvenile gave us and we learned that it was registered to 3310 Crystal and the last name of Parker." Detective Duffin repeated several times that the subscriber's name was Parker. However, the parties stipulated that, although one number was registered to a party at 3310 West Crystal Avenue, neither number was registered to a subscriber named Parker.

¶ 27    Detective Duffin testified that Detective Mihajlov then ran a juvenile arrest record check on the name "Dennis Parker" and obtained a physical description that, Duffin stated, matched a physical description previously provided by codefendants Over and Smith.

¶ 28    However, none of the detectives had testified that codefendants Over and Smith had provided a physical description of "Dennis." Detective Duffin had specifically testified that the only information that codefendants Over and Smith had provided about "Dennis" was to provide the name of a juvenile who allegedly knew him.

¶ 29    Detective Duffin testified that, on August 26, 1999, at 7 a.m. he and Detectives Mihajlov and Wright went to 3310 West Crystal Avenue, where they spoke with Dennis Parker, Sr.[1] The detectives left a business card and asked the father to call them when his son was home. Detective Duffin could not recall whether the father had called them, but they returned at 9 a.m. and arrested defendant.

¶ 30    Detective Duffin testified that the juvenile had stated that "Dennis" had a Spaulding Avenue address. However, when Duffin arrested defendant, defendant's home was not on Spaulding Avenue but at 3310 West Crystal Avenue. Duffin then explained that the building was located at the corner of Spaulding and Crystal.

¶ 31    Detective Duffin testified that he could not recall whether, after defendant's arrest, defendant had any contact at the police station with codefendants Over or Smith.

¶ 32    The hearing adjourned and then on December 22, 2003, the defense called two rebuttal witnesses. First, the defense called Gail Watkins, defendant's mother, who testified that defendant lived at her home at 3310 West Crystal Avenue, that her last name has never been Parker, and that during the eight years she has lived at that address there has never been a telephone registered in the last name of Parker. Watkins testified that defendant's father, who is named Dennis Parker, Sr., has never lived at that address and has never had a telephone registered at that address.

¶ 33    The defense next called John Hunt, who testified that he has lived with defendant's mother for eight years. Hunt confirmed defendant's mother's testimony that they never had a telephone registered in the name of Parker. Hunt testified that he has never identified himself to the police or to anyone else as Dennis Parker, Sr., and that defendant's father was not at their home on August 26, 1999, when defendant was arrested. Hunt testified that defendant's father has never lived at their home.

---

[1]The defense called a rebuttal witness, John Hunt, who stated that he had lived with defendant's mother for eight years, that he was present when the police officers arrived, that Dennis Parker, Sr., was not in their home on the day of the arrest, and that he (Hunt) has never identified himself to the police or to anyone else as Dennis Parker, Sr.

¶ 34　　　The trial court denied the motion to quash the arrest for lack of probable cause, stating:

> "The court finds that the police went and grabbed Mr. Parker and chose to investigate him not out of a whole vacuum or false information. As a matter of fact, if I were to accept the petitioner's propositions, there would have been no reason at all. They just made it up out of thin air and just took him out as opposed to any of the other five point million people in Cook County and let him fall [*sic*] on him for no reason at all.
>
> 　In fact, the detectives were able to articulate the reasons why they believed that Dennis Parker was a suspect in this investigation. They articulated them to my satisfaction."

¶ 35　　　　　　　　　　　　　B. Motion to Suppress Statements

¶ 36　　　Prior to trial, defendant also sought to suppress his confession on the grounds that he was not read his *Miranda* rights prior to his initial interrogation, that defendant asserted his right to remain silent and to talk to an attorney, and that the statements were the product of physical and mental coercion and thus not voluntary.

¶ 37　　　At the suppression hearing which began on February 5, 2004, the State's first witness was Detective William Wright, who testified that, on August 26, 1999, he spoke with defendant shortly after 9 a.m. in a room at Area 4 headquarters. Detective Wright, who was retired by the time of the suppression hearing, had worked for the Chicago police department for 35 years and in the violent crimes unit for 15 years. Detective Wright testified that his "normal routine" would be to introduce himself and to read the *Miranda* warnings, and that the individual would not be handcuffed once inside the locked room. Wright testified that he was the only person present in the room with defendant, who was then 18 years old. Wright did not present defendant with a written *Miranda* waiver to sign, and defendant denied any knowledge of the offense.

¶ 38　　　Detective Wright testified that he questioned defendant a number of times on August 26, 1999. The first time was at 9 a.m.; the next time was at noon. At noon, Wright testified that he was again the only person in the room with defendant and that they were in the same room as before. Wright read defendant his *Miranda* rights again, and again did not present defendant with a written *Miranda* waiver. Wright testified that it was during this second session that defendant first incriminated himself. According to Wright, this session lasted about 15 or 20 minutes.

¶ 39　　　Detective Wright admitted that, prior to defendant's incriminating remarks at noon, Wright "probably" discussed with defendant what he (Wright) knew about the investigation.

¶ 40　　　Detective Wright testified that he went into the same room a third time at 2 p.m., and again the only people present were himself and defendant. Wright did not call an assistant State's Attorney between noon and 2 p.m. because he felt that defendant's "case hadn't progressed" far enough. Wright did not recall whether, at this time, he provided defendant with more details about the offense. Detective Wright testified that he reminded defendant of the *Miranda* rights that had previously been read, and that this third session lasted 30 or 40 minutes.

¶ 41    Detective Wright testified that, after he had spoken with defendant a number of times, he contacted Assistant State's Attorney (ASA) Robin Mitchell in the early evening of August 26. After ASA Mitchell arrived at Area 4 headquarters, she also spoke with defendant in the same room, with Detective Wright present. Wright testified that ASA Mitchell read defendant his *Miranda* rights and questioned him. At some point, defendant and ASA Mitchell were together outside of Detective Wright's presence.

¶ 42    Detective Wright testified that, shortly before midnight on August 26, a videotaped recording was made of defendant's statement. At that point, defendant had been in custody for almost 15 hours. Detective Wright was present in a special videotaping room with ASA Mitchell and defendant, while the videographer was outside of the room recording the statement.

¶ 43    Detective Wright testified that ASA Mitchell provided *Miranda* warnings during the videotaping, and he also identified a written consent to videotape form. It was a two-page document with the consent to videotape on the first page, and a written waiver of *Miranda* rights on the second page. The first page was signed by Detective Wright, defendant and ASA Mitchell. The second page with the *Miranda* waiver was not signed by defendant. Someone had printed defendant's name on the waiver, but Wright testified that the printing was not defendant's signature and that the printing was not in Wright's handwriting. The waiver also did not contain defendant's initials after each *Miranda* right.

¶ 44    Detective Wright testified that, prior to the videotaping, defendant was provided with a sandwich, ice cream and a Mountain Dew soda.

¶ 45    The State next wanted to call ASA Mitchell but she was not available, and so the defense agreed to call defendant out of order.

¶ 46    Defendant testified that he was 18 years old when he was arrested and that he had been held back in school. During the time that he was in the interrogation room at the police station, he was handcuffed to a bolt in the wall. There was no clock in the room, and he was not wearing a watch. Defendant was not read his *Miranda* rights prior to entering the room, and when the detective came in talk to him in the morning, the detective did not read defendant his *Miranda* rights at that time. The detective told him that people had said some things about defendant, and the detective told him some of the things that had been said.

¶ 47    Defendant testified that, when the detective came back a second time, he again did not read defendant his *Miranda* rights. Defendant identified the detective as the same one who had just testified (who would have been Detective Wright). Defendant also testified that there was another detective in the interrogation room, in a suit and with a moustache. Defendant asked for an attorney, and Detective Wright responded that, after defendant made a statement, the detective would try to call an attorney. The two detectives were in the interrogation room with defendant "a long time." The detectives told defendant that a person by the name of Murry Over was saying that defendant was one of several men who participated in the murder of a woman named Niquita Johnson.

¶ 48    Defendant asked if he could make a telephone call, and he was allowed to call his aunt, Josephine Love. Detective Wright was present during the telephone call, when defendant told his aunt that he wanted a lawyer. Then the line went dead. The detectives then told defendant

that they would give him an attorney after he made a videotaped statement.

¶ 49    Defendant testified that Detective Wright threatened him stating that, if defendant did not make a videotaped statement, the detective would make sure that defendant would "get this case" and "get found guilty on it." Defendant testified that he had never been arrested before and that he had "never been in a situation like this." Defendant was not given any food or anything to drink.

¶ 50    Defendant testified that he gave a statement after the police had told him facts about the case and he repeated those facts back to them during the videotaped confession. The ASA spoke to him alone prior to the taping but she did not ask him how he was treated by the police. The ASA and the detectives did not read him his *Miranda* rights prior to the videotaping, but they did read his rights during the taping. That was the first time that he was read his rights. After the videotape, he expected that he would be allowed to talk to a lawyer but that did not happen. The only reason that he spoke on the videotape was so that he would be provided with a lawyer.

¶ 51    The State then recalled Detective Wright as a rebuttal witness and asked him only one question: whether he had told defendant that he "would put the case on him anyway and he would go to jail." Wright replied "no" and was excused.

¶ 52    Three months later, on May 3, 2004, the State called ASA Robin Mitchell, who testified that she arrived at 6 p.m. on August 26, 1999, at Area 4 headquarters and spoke with defendant. When she entered the room, defendant was not handcuffed. Detective Wright was also present. After she gave defendant his *Miranda* rights, she asked Detective Wright to leave the room and she asked defendant how he had been treated by the police and he said fine. He said that he had received a sandwich and a soda. Then she asked Detective Wright to return. When Detective Wright returned, she asked defendant to provide a statement which he did. She then gave him several options for memorializing his statement, and he chose the videotape option. ASA Mitchell then offered him ice cream, and he was taken to a room that is specifically set up for videotaping.

¶ 53    ASA Mitchell testified that, prior to the taping, she prepared an outline for the statement, a consent to videotape form and a *Miranda* waiver form. Defendant signed the consent form, and the taping began at 11:30 p.m. ASA Mitchell noticed that defendant was stuttering, but she did not ask if he was nervous.

¶ 54    The trial court denied the suppression motion, stating that this was a credibility issue and that he found ASA Mitchell credible.

¶ 55    II. Trial

¶ 56    This court previously described the evidence presented at trial in our prior Rule 23 order:

"At trial, [Detective Michael] Hughes testified that on August 25, 1999, he was assigned to investigate the victim's death. Hughes stated that in the alley behind 3531 West Governor's Parkway in Chicago there was a car with the trunk open and fire department personnel standing nearby. Inside the trunk was a partially charred body, whom Hughes later learned was identified as the victim, Niquita Johnson. The vehicle

had license plate number 'NITAS98,' which was registered to Niquita Johnson at 722 North Central Park Avenue in Chicago. At that address, Hughes spoke to [Murry] Over and [Tiffany] Williams, and then spoke to the victim's boyfriend, Robert Green.

Hughes then stated that he 'returned to the house on Central Park,' and that he, [Detective Robert] Fujara, and Chicago police detective [Tom McGloury] Miglore conducted a permitted search 'of the house.' Their attention was drawn to the victim's bed because it was 'made in a military style,' i.e., it was very taut, and did not appear to have been slept in. They then lifted the mattress up, and saw what appeared to be a bloodstain. In addition, Hughes saw a series of blood spatters inside the bedroom that led out the back door of the 'apartment,' down the back stairs, and across the yard to a carport. Hughes then took Over to the police station. According to Hughes, Over provided them with a phone book, and Hughes began to look for defendant. On cross-examination, however, Hughes admitted that he was not aware of any fingerprints or blood recovered from the scene that matched defendant.

The parties then stipulated to the following: (i) blood found on a gangway near the victim's home and on a shovel recovered from the scene matched the victim's DNA, (ii) a shovel, two knives, a mop, and a nightstick were recovered from the victim's home; (iii) one of the knives did not have a handle; (iv) defendant's fingerprints were not found on any of the items.

Wright then testified that on August 26, 1999, he was involved in defendant's arrest, and interviewed defendant at 9:20 a.m. and 12:30 p.m., prior to calling Assistant State's Attorney Mitchell to interview defendant. Wright added that he saw defendant sign a consent form for his videoptaped statement, and was present during the videotaping.

The State then played defendant's videotaped confession. On the videotape, defendant admitted that on August 25, 1999, he was a student at Orr High School. After school, Over paged Smith with a '911 code,' which defendant explained meant that they should go to Over's 'house' immediately.

Defendant stated that he and Smith then went to '[Over's] house,' and that Over, Williams, and the victim 'lived in the house.' Defendant described the building as having a vacant upstairs apartment, and a downstairs apartment where the victim lived, and that Over and Williams lived in the basement. When the Assistant State's Attorney specifically asked defendant whether Over and Williams lived in a separate apartment, however, defendant only said that they 'stay in the basement.' Defendant added that when he entered the basement, the victim was watching television 'in her room *** [on the] first floor.'

In the basement, defendant stated that he, Over, Smith and 'Lloyd' were smoking marijuana and drinking, and after a while Over stated that he wanted to kill the victim because Over claimed the victim 'stole a large lump sum of money' from him and threatened to turn off his phone service. Over asked Lloyd and defendant if either of them had a gun, but they both said they did not. Lloyd suggested that Over use a knife, and Over agreed.

Defendant, Over, Lloyd, and Smith continued to drink and smoke marijuana 'for a

while.' Then, Over went upstairs to make sure the victim was asleep. While Over was upstairs, he took a knife from the kitchen, while Lloyd took a shovel that was in the basement, and went upstairs with the defendant and the other co-offenders.

Defendant stated that Lloyd hit the victim on the head with the shovel three times, Smith stabbed the victim six or seven times in her throat, and that defendant stabbed the victim five or six times in her lower abdomen. Defendant stated that the victim's baby was sleeping next to the victim, and that he subsequently told Lloyd and Smith to stop stabbing the victim so that defendant could take the baby to Williams in the basement to clean the victim's blood off of the baby's face.

When defendant returned from the basement, he helped wrap the victim's body in blankets and pull it outside, and also helped clean up the blood on the victim's bed and elsewhere in her bedroom. Defendant stated that when Lloyd opened the trunk of the victim's car, the alarm sounded. Defendant helped the co-offenders remove everything from the trunk, and also helped place the victim's body in the trunk of her car. When Lloyd tried to start the car, the alarm sounded, and Lloyd silenced the alarm by ripping it out of the car. Because the car still would not start, defendant and Smith pushed the car to an alley, while Lloyd steered it. Lloyd then opened the trunk, sprayed lighter fluid on the victim's body, and lit it with a match.

Defense counsel then cross-examined Wright. Wright conceded that at no time did he have defendant sign a written waiver of his *Miranda* rights, that he did not have defendant write out any incriminating statements defendant had made, and that he did not have his interviews with defendant videotaped. Wright further admitted that there was no recording of defendant choosing to provide a videotaped statement." *People v. Parker*, No. 1-05-2201 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 57    After closing arguments, the trial court specifically observed that the primary evidence against defendant was the videotaped statement. The trial court found defendant guilty of first-degree murder, home invasion, arson and concealment of a homicidal death.

¶ 58    At the sentencing on January 4, 2005, defendant stated unequivocally: "I didn't commit a murder, I did nothing of the sort." Defendant talked about how he had stayed in school and how he had never joined a gang, and how he was now leaning on his faith for support. He stated that the State had made offers but he had turned them down because: "I knew in my heart that I really didn't do nothing." After the trial court observed that "Mr. Parker has never been arrested in his life," and that he had made good use of his time in jail, the trial court announced that it would not impose the death penalty as requested by the State. The trial court then sentenced defendant to 45 years for murder, 30 years for home invasion, 7 years for arson and 5 years for concealment of a homicidal death, with all sentences to run concurrently.

¶ 59                              III. Direct Appeal

¶ 60    On direct appeal, defendant raised three claims: (1) that his fourth amendment rights were violated because the police arrested him without probable cause; (2) that the State failed to prove an essential element of home invasion and arson; and (3) that his multiple

convictions for murder and home invasion violated the one-act, one-crime rule. Although this court did not find his fourth amendment claim persuasive, we did vacate defendant's arson conviction on the ground that the State had failed to prove that offense beyond a reasonable doubt. We also vacated several other counts under the one-act, one-crime principle, so that the mittimus reflected convictions for only one count of murder, one count of home invasion and one count of concealment of a homicidal death. *People v. Parker*, No. 1-05-2201 (2008) (unpublished order pursuant to Supreme Court Rule 23).

¶ 61                                     IV. Postconviction Petition

¶ 62        On April 14, 2010, defendant filed a *pro se* postconviction petition raising two claims: (1) a fourth amendment claim that he was arrested without probable cause: and (2) a claim of actual innocence. In his petition, he stated, as he had at sentencing, that he was innocent. He also stated that he did not know any of the codefendants prior to his arrest in this case.

¶ 63        In support of his actual innocence claim, defendant attached a verified affidavit from codefendant Lloyd Satterfield, dated January 3, 2010. The affidavit stated that: "[p]ursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury, that everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith." However, the affidavit was not notarized.

¶ 64        Satterfield's affidavit stated in full:

> "That on July 16 2001, I entered into a negotiated plea of guilty to two counts: first degree murder (felony murder predicated on home invasion) and home invasion.
>
> I entered into this negotiated plea of guilty because at all time[s] I had murder[ed] Niquita Johnson on August 25, 1999.
>
> And that on August 27, 1999, at 10:31 p.m., I advise[d] Joan Kuruc, Assistant State's Attorney that I did not know Dennis['] last name was Parker.
>
> Also, that on the day of arrangement [*sic*], I advise[d] the Assistant Public Defender of the fact that Dennis Parker had nothing to do with this murder of Niquita Johnson, and that I never seen him in my life. I was told by this Assistant Public Defender to not talk like that or I would selfincriminat[e] myself. So I kept quiet of [*sic*] of this issue.
>
> When I enter the Illinois Department of Corrections I was going to send Dennis Parker['s] mother a[n] Affidavit, but I did not because I found out that my lawyer lied to me by telling me that I was going to only do 30 years of a 60 year sentences [*sic*] and that I was going to do my sentences at Dixon Facility. So I appeal my plea of guilty and this appeal stop me from sending a[n] Affidavit to Mr. Dennis Parker['s] mother.
>
> If I was to call to give my account of the murder of Niquita Johnson I would say that Dennis Parker never attended this murder and he play no part of this murder.
>
> As there is a Dennis who attended the murder and I don't know his last name. But Dennis Parker is not him."

¶ 65        On May 28, 2010, in open court, the trial judge stated, incorrectly, that defendant was

-12-

raising only the fourth amendment claim that had been previously litigated on direct appeal and that his petition made "no claims about actual innocence or anything of the sort." The trial court also incorrectly stated that defendant was serving a 30-year sentence. Defendant is serving a 45-year sentence on the murder charge.

¶ 66                                    ANALYSIS

¶ 67    Defendant filed a *pro se* postconviction petition asserting a claim of actual innocence. This is defendant's first postconviction petition. The trial court summarily dismissed the petition at the first stage of the postconviction process. Although the petition stated that defendant was asserting a claim of actual innocence and included a supporting affidavit, the trial court stated incorrectly that defendant had raised "[n]o claims about actual innocence or anything of the sort."

¶ 68                              I. The Standard of Review

¶ 69    A trial court's first-stage dismissal is reviewed by us *de novo*. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). In the case at bar, since the trial court failed to make a ruling on defendant's actual innocence claim, there is technically no ruling below for us to review. However, since *de novo* consideration means that we must perform the same analysis that a trial judge should have performed (*Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)), there is no reason for us to refrain from hearing this appeal.

¶ 70    At the first stage of a postconviction proceeding, a trial court should determine only whether the petition is frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). A court may dismiss a petition as frivolous or patently without merit only if it has no arguable basis in law or fact, which means that it is based either on an indisputably meritless legal theory or a fanciful factual allegation. *Hodges*, 234 Ill. 2d at 16.

¶ 71                                 II. Notarization

¶ 72    As noted above, defendant does not pursue on appeal his fourth amendment claim and the State does not pursue on appeal the one ground relied on by the trial court, namely, *res judicata*. *Wilborn*, 2011 IL App (1st) 092802, ¶ 45 (in a postconviction appeal, "we consider only those claims *** raised in this appeal"); Ill. S. Ct. R. 341(h)(7) (eff. July 4, 2008) ("Points not argued are waived ***.").

¶ 73    Instead, the State argues that we may affirm the dismissal on any basis found in the record and argues, as its first ground, a ground that was not relied on by the trial court. The State argues that we should affirm because one of the two affidavits submitted by defendant was not notarized. In its appellate brief, the State concedes that "defendant attached his own sworn affidavit which can qualify as the verification affidavit required by 725 ILCS 5/122-1(b) [(West 2010)]."

¶ 74    However, the State argues that we should affirm the dismissal because the second, supporting affidavit was not notarized. As noted above, this court has rejected this argument twice before. *Wilborn*, 2011 IL App (1st) 092802, ¶ 72 (a trial court may not dismiss a

petition at the first stage simply because a supporting affidavit lacks notarization); *Henderson*, 2011 IL App (1st) 090923, ¶ 36 ("an unnotarized verification affidavit is not an appropriate basis for first-stage dismissal of a petition").

¶ 75    When discussing a lack of notarization, this court has drawn a distinction between the first and second stages of the postconviction process. This court has held that the purposes of the [Post-Conviction Hearing] Act would be hindered by preventing petitions that are neither frivolous nor patently without merit from advancing to the second stage " 'due to the technicality' " of a lack of notarization. *Wilborn*, 2011 IL App (1st) 092802, ¶ 72 (quoting *Henderson*, 2011 IL App (1st) 090923, ¶ 35). At the second stage, the State will have the opportunity to object to the lack of notarization, and appointed counsel will be able to assist the petitioner in arranging for notarization. *Wilborn*, 2011 IL App (1st) 092802, ¶ 72; *Henderson*, 2011 IL App (1st) 090923, ¶ 35.

¶ 76    In the case at bar, the State claims that, since a supporting affidavit from a codefendant lacked notarization, the trial court was not required to consider it, and thus the trial court properly dismissed defendant's petition at the first stage because it lacked supporting documentation. We considered and rejected this exact same argument in *Wilborn*. In *Wilborn*, the State argued, as it does here, that "the trial court was not required to consider [a codefendant's] affidavit and [that] the court properly dismissed defendant's postconviction petition [at the first stage] because it lacked supporting documentation." *Wilborn*, 2011 IL App (1st) 092802, ¶ 68. Rejecting this argument, we stated unequivocally "[w]e disagree" (*Wilborn*, 2011 IL App (1st) 092802, ¶ 68) and we expressly adopted the reasoning of *Henderson*, where we stated that we would not let a " 'technicality' " prevent a *pro se* petition from advancing to the second stage. *Wilborn*, 2011 IL App (1st) 092802, ¶ 72 (quoting *Henderson*, 2011 IL App (1st) 090923, ¶ 35).

¶ 77    In the case at bar, we can find no reason to depart from our established precedent, and thus we do not find the State's argument persuasive.

¶ 78                            III. Actual Innocence Claim

¶ 79    The State's second argument is that a codefendant's affidavit can never constitute newly discovered evidence.

¶ 80    In the case at bar, defendant's petition alleges that he is actually innocent of the underlying offense. The wrongful conviction of an innocent person violates due process under the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2), and thus, a defendant can raise in a postconviction proceeding a freestanding claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009); *People v. Washington*, 171 Ill. 2d 475, 489 (1996).

¶ 81    In *Ortiz*, our supreme court held that, to assert a claim of actual innocence based on newly discovered evidence, a defendant must show that the evidence was (1) newly discovered; (2) material and not merely cumulative; and (3) of such a conclusive character that it would probably change the result in trial. *Ortiz*, 235 Ill. 2d at 333-34; *People v. Orange*, 195 Ill. 2d 437, 450-51 (2001) (citing *People v. Molstad*, 101 Ill. 2d 128, 134 (1984)).

-14-

¶ 82    The *Ortiz* court defined newly discovered evidence as "evidence [1] that has been discovered since the trial and [2] that the defendant could not have discovered sooner through due diligence." *Ortiz*, 235 Ill. 2d at 334. In the case at bar, the State does not argue that the codefendant's statements were actually discovered before trial, so the first part of the "newly discovered" definition is satisfied. *Molstad*, 101 Ill. 2d at 134 (the State does not dispute that the affidavits were prepared after the guilty verdict, so the first part of the definition is satisfied). The State argues only about the second "could have been discovered" part.

¶ 83    The State argues that a codefendant's exculpatory affidavit can never constitute newly discovered evidence because, since the codefendant was known to defendant, his affidavit "could have been discovered" earlier. However, our supreme court already dispensed with that argument in *People v. Molstad*, 101 Ill. 2d 128, 135 (1984), where it held that the codefendants' affidavits constituted "new evidence," although the codefendants were previously known to defendant, because "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." *Molstad*, 101 Ill. 2d at 135.

¶ 84    Recently, our supreme court reaffirmed its adherence to *Molstad*, by citing it with approval and applying the *Molstad* holding to the facts before it. *People v. Edwards*, 2012 IL 111711, ¶ 38 (citing *Molstad*, 101 Ill. 2d at 135). In *Edwards*, our supreme court held that a codefendant's affidavit was "newly discovered" evidence, despite the fact that the codefendant's identity was "obviously" known to defendant at the time of trial. *Edwards*, 2012 IL 111711, ¶ 38. Citing *Molstad*, our supreme court stated once again that, since the codefendant had "a fifth amendment right to avoid self-incrimination," "[n]o amount of diligence could have forced him to violate that right if he did not choose to do so." *Edwards*, 2012 IL 111711, ¶ 38 (citing *Molstad*, 101 Ill. 2d at 135)[2]. Thus, our supreme court has laid to rest the argument that a codefendant's affidavit can never qualify as newly discovered evidence.

¶ 85    If believed, the affidavit submitted by petitioner in this case is completely exculpatory. The affiant stated: "If I was to call to give my account of the murder of Niquita Johnson[,] I would say that Dennis Parker never attended this murder and he play no part [*sic*] of this murder." In the case at bar, there was neither physical evidence nor eyewitness testimony, and the primary evidence was a confession obtained after multiple interrogations and 15 hours in custody, from a defendant who was a high school student and who had no prior record, no juvenile adjudications, and no gang affiliation, and who had been held back in

---

[2]The outcome in our case differs from *Edwards*, although both cases involved actual innocence petitions based on a codefendant's affidavit. In *Edwards*, our supreme court affirmed the denial of leave of court to file a successive postconviction petition that asserted actual innocence based on a codefendant's affidavit. *Edwards*, 2012 IL 111711, ¶ 43. Our case is different because, first and foremost, our supreme court applied a different standard of review since the petition before it was a successive petition (*Edwards*, 2012 IL 111711, ¶¶ 24-25), and second, because the codefendant's affidavit was not completely exculpatory in light of the fact that defendant was charged under an accountability theory (*Edwards*, 2012 IL 111711, ¶ 39).

school. *People v. Villa*, 2011 IL 110777, ¶¶ 55-56 (holding that there was a "reasonable probability" that defendant "would have been acquitted of the charged offenses" where "[t]he only evidence in this case implicating defendant in the *** shooting was his statement to the police").

¶ 86  Although "a reviewing court may sometimes raise and consider unbriefed issues in order to provide 'for a just result and for the maintenance of a sound and uniform body of precedent,' " our review of the record does not disclose any unbriefed issues that would prevent this case from proceeding to the second stage. *People v. Givens*, 237 Ill. 2d 311, 325 (2010) (quoting *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967)). Defendant's petition is not based on an indisputably meritless legal theory or a fanciful factual allegation. *Hodges*, 234 Ill. 2d at 16. As a result, we must reverse and remand for second stage proceedings.

¶ 87                                    CONCLUSION

¶ 88  For the foregoing reasons, we reverse the trial court's first-stage dismissal of defendant's first postconviction petition and remand for second-stage consideration.

¶ 89  Reversed and remanded.