2021 IL App (1st) 191902-U

No. 1-19-1902

November 2, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 C5 50078 |
| | ) | |
| PATRICK SICILIANO, | ) | Honorable |
| | ) | Steven J. Rosenblum, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*:  Defense counsel was not ineffective for asserting in opening statement that the jury would hear alibi evidence, but not presenting such evidence.

¶ 2    Following a jury trial, defendant Patrick Siciliano was convicted of burglary (720 ILCS 5/19-1(a) (West 2018)) and identity theft (720 ILCS 5/16-30(a)(1) (West 2018)) and sentenced to concurrent prison terms of three years. On appeal, defendant argues that defense counsel was

ineffective for asserting in his opening statement that he would produce alibi evidence but presenting no such evidence to the jury. We affirm.

¶ 3 Defendant was charged by information with multiple offenses arising from an incident on January 7, 2018, wherein he allegedly stole a debit card from the victim's vehicle and used it to purchase goods. The State proceeded on counts of burglary and identity theft. In an amended answer to discovery, defense counsel advised that defendant's mother would testify that defendant was at her home when the offenses occurred.

¶ 4 At trial, defense counsel asserted in his opening statement:

"You're going to hear evidence that [defendant] was at home with his mother talking to his girlfriend on Facetime. You're going to hear that it is not possible for [defendant] to have committed this crime because he wasn't even there. *** With regard to the burglary, there is going to be an alibi defense. *** You're also going to hear evidence that [defendant] had no idea that he was using a stolen *** or usurped credit card."

¶ 5 Karina Valencia testified that on January 7, 2018, she lived with her husband, children, and parents on the 79th block of South Newland Avenue in Burbank, Illinois.[1] Karina arrived home with her children as it began snowing. She was "in a rush," and left her purse and wallet on the floorboard of her unlocked vehicle in the driveway. At 10:30 p.m., she was in her bedroom near the driveway, and heard the vehicle door slamming shut and her parents loudly talking. Karina sprinted upstairs, and her mother informed her that someone "broke into" her vehicle. Karina went to her vehicle, opened the door, and saw it had been "trashed," with items from inside the middle

_____

[1] Karina Valencia shares the same last name with another witness, Jose Valencia. Accordingly, we will refer to these witnesses by their first names.

console "thrown around" on the seat and floor. She did not see her purse, and did not observe damage to the vehicle. She identified photographs of the scene, which are included in the record on appeal and depict a vehicle's interior in disarray. Once the police arrived, Karina described her missing purse and wallet, which contained her Navy Federal debit card.[2]

¶ 6      Karina contacted Navy Federal, which advised that her debit card had just been used at a Speedway gas station "[l]ess than a mile away." She informed the officers, and they traveled there with Karina's father. Later that night, Karina went to the Burbank Police Department and viewed photographs of her items. Karina had never seen defendant before, and had never permitted him to enter her vehicle, take her purse, wallet, and debit card, or use the card.

¶ 7      On cross-examination, Karina stated that she arrived home at approximately 9 p.m., just as it started snowing. The snow became thicker as the night progressed, which she agreed "obstructed visibility," and the night was dark. After Karina heard her parents speaking, she took "less than a minute" to travel upstairs. Karina did not see anyone outside. Her wallet contained her debit card, a gift card, daycare cards, and receipts. Karina agreed she would not use her debit card as identification, and did not know who took her purse and debit card that day.

¶ 8      On redirect examination, Karina identified the photographs of her purse and wallet on the snowy ground, which police officers showed her and are included in the record on appeal. Karina also identified her debit card, which had her name and account number, and her pink gift card, which had no identifying marks. On recross examination, Karina stated she did not know where the purse, wallet, debit card, and gift card were recovered.

_____

[2] Karina initially referred to her Navy Federal card as a credit card, but clarified on cross-examination that it is a debit card. Accordingly, we refer to it as a debit card.

¶ 9 Jose Valencia testified through an interpreter that on January 7, 2018, at approximately 10:30 p.m., he was on the first floor of the residence when he heard a door close outside. He looked outside and saw someone wearing dark gray clothing and holding a wallet. The person had long black hair, which "was moving back and forth," but Jose could not see his face. The person went to the street, turned right, and checked the neighbor's vehicle doors. Jose then went into the living room to call the police.

¶ 10 From the living room, Jose saw another person across the street looking toward Jose's house, so he believed the people were together. He could not see the person's face, but the person was tall and "a little chubby." The police arrived approximately three minutes later and drove Jose to an IHOP restaurant a mile away. There, Jose viewed several individuals from inside the vehicle. Jose asked that the individuals turn around, and identified one partly because he recognized that person's hair.

¶ 11 Jose then identified the photograph of his house and marked his location when he saw the person holding the wallet, and that person's path on the sidewalk. Jose also identified a photograph of the person he identified at the IHOP. This photograph is included in the record on appeal, and depicts the right profile of a man's head with dreadlocks.

¶ 12 On cross-examination, Jose stated there was some artificial lighting when he saw the person with the wallet outside the house, and it was snowing but "you can see clearly." Jose described the distance between himself and that person in relation to the distance from the witness stand to defense counsel, which the court estimated as 10 to 12 feet. Jose believed the person was wearing a sweatshirt "between gray and brown" without a hood or markings. The person's hair was "weird" and it was "hard" to see whether it was dreadlocks, although he noticed the hair was

"heavy because the air wasn't moving it." The person was wearing the same clothes when Jose saw him again at the IHOP. Approximately 10 minutes elapsed from the time of the theft to the identification.

¶ 13    The State then entered a stipulation that Jonathan Scott would testify he worked at the Speedway on January 7, 2018. The security cameras positioned over the entrances and cashier's stations record video but not audio. Scott would identify the DVD of the footage, which truly and accurately depicted events from January 7, 2018, at approximately 10:38 p.m.

¶ 14    Jaclyn Beissmann testified that she was the general manager of the Speedway on January 7, 2018, but did not work that day. The Speedway had over 35 cameras, including at the entrances and cash registers, and the video recordings were stored on a DVR system in the manager's office. Every day at 6 a.m., all transactions from the register enter a hard drive system where managers can access transaction journals containing credit card information.

¶ 15    On January 8, 2018, Beissmann isolated a video for police officers and found a transaction journal matching the last four digits of the debit card at issue, which she identified in court. The transaction journal showed that on January 7, 2018, at 10:38 p.m., Scott handled a transaction for a candy bar totaling $2.19. The transaction journal is included in the record on appeal and depicts the sale.

¶ 16    Officer Malloy testified that on January 7, 2018, he responded to the burglary and spoke with Jose, who spoke "broken English" but "could make himself clear."[3] Jose described the perpetrators as "two male Hispanic or white teens wearing dark jackets, skinny." Malloy broadcast that information over the radio. Malloy received a message from a Bridgeview officer regarding

---

[3] Officer Malloy's full name does not appear in the record on appeal.

individuals matching the description. Jose agreed to view a show-up, and they traveled to the IHOP.

¶ 17    When they arrived, one individual was outside, but Jose did not identify him as the offender. Malloy then entered the IHOP and saw defendant at a table with another man. Defendant denied knowing the other person and did not give Malloy "a good reason" for being out. Defendant also informed Malloy he carried a hammer underneath his jacket for "protection"; Malloy identified the hammer in court. Malloy then took defendant and the other man outside, and from inside the police vehicle, Jose identified defendant as the person from his driveway. Malloy arrested defendant and recovered a pink gift card from defendant's jacket pocket, which he identified in court.

¶ 18    At the station, Malloy spoke with the other man and then traveled to an alley at the 80th block of Newland Avenue, where he saw a purse and wallet. Malloy identified the photographs of the purse and wallet. Karina later identified her items and provided information about her debit card. Malloy then traveled to the Speedway, and Beissmann provided surveillance footage and a receipt. The surveillance footage from the Speedway and a still photograph from the footage were published and are included in the record on appeal.

¶ 19    The surveillance footage depicts two angles of the interior of a gas station. Three men enter the Speedway. One man, whom Malloy identified as defendant, wears a blue jacket with gray or silver reflective horizontal stripes and a raised hood. The men approach the cashier and defendant takes an item from inside a front jacket pocket, inserts it into the credit card reader, and signs the display. The men then leave. The still image shows the three individuals.

¶ 20    On cross-examination, Malloy stated that during the show-up, Jose asked defendant to turn to his side, and defendant's hood was down. Jose took 10 to 15 seconds to identify defendant.

¶ 21    Bridgeview investigator Paul Tsiamis testified that on January 7, 2018, he responded to the burglary. Tsiamis observed three individuals on 79th Street enter and exit the Speedway, and continue walking to the IHOP. Tsiamis did not see anyone else outside. After the individuals entered the IHOP, Tsiamis broadcasted that he observed suspects who matched the description of the offenders. Tsiamis identified defendant in court as one of those individuals, and stated that the still image from the Speedway surveillance footage depicted the three individuals who entered the IHOP.

¶ 22    Tsiamis and Malloy later conversed with defendant at the IHOP, and he told them that one of the other individuals was his brother Ramon, but he did not know the other individual. Malloy asked defendant about a bulge on his waist, and defendant told him it was a hammer, which he used "for protection." Defendant had two cards in his pocket, including a pink gift card that Tsiamis identified in court.

¶ 23    On cross-examination, Tsiamis stated the suspects were described on the radio as two Hispanic "male teens [wearing] dark clothing." Tsiamis began following the individuals because two matched the description of the offenders, although he could not see their skin color because it was snowing. The three individuals were wearing heavy coats or jackets, and defendant's hood was raised. Tsiamis did not recall seeing reflective stripes on defendant's jacket. Malloy searched defendant, and Tsiamis saw a gift card in defendant's pocket. The "credit card" was located on a booth next to where the individuals were sitting.

¶ 24    Officer Wasilewski testified that he responded to the burglary.[4] The vehicle was "ransacked," and the contents of the glove box and center console were "thrown about" the cabin. Wasilewski then traveled to the IHOP where he saw defendant and two other individuals. Wasilewski searched the dining room and found Karina's Navy Federal card beneath a table. He recovered and inventoried the card, and identified it in court. Another officer recovered a hammer and gift card from defendant, and Wasilewski inventoried the items.

¶ 25    Wasilewski then returned to the initial location to photograph the scene and search for additional evidence. Later, Wasilewski was directed to the 80th block of South Newland Avenue, less than a city block from the burglary. There, he photographed and inventoried a purse and wallet on the ground near a garage.

¶ 26    On cross-examination, Wasilewski stated he was not present when the items were recovered from defendant. Wasilewski did not recall any cash being recovered from defendant's person, but his inventory report stated officers recovered a sealed cash envelope from defendant containing $117.81. The inventory report did not state where the Navy Federal card was recovered. On redirect examination, Wasilewski identified another report that he had generated that stated the Navy Federal card and gift card were owned by Karina and possessed by defendant.

¶ 27    Outside the presence of the jury, the State informed the court it intended to rest its case-in-chief. Defense counsel responded that he spoke with defendant, who did not intend to testify, call his mother as a witness, or present other evidence. The court noted defense counsel had asserted in his opening statement that he would provide an alibi defense. The court stated:

---

[4] Officer Wasilewski's full name does not appear in the record on appeal.

"I assume at the time that you made those arguments, it was trial strategy and that's what your intent was. And, obviously, during the course of the trial, sometimes evidence comes out or you believe you have a different defense, and I understand that. But if you decide to go forward with that, I will not preclude the State from arguing that the evidence of the alibi was not presented during this trial."

¶ 28    Defense counsel agreed but also noted that if the State argued the point further, the court would be presented with potential burden shifting. The following colloquy occurred:

"THE COURT: *** I understand that there are trial strategies involved in this and I wanted to make sure that your client was aware of it. That's why I'm discussing it in open court.

[DEFENSE COUNSEL]: Yes.

THE COURT: That he has presented that to the jury, [defendant], and is not going to present evidence to that.

Have you discussed with your attorney your trial strategy along with what he believes is the best course of action at this time?

[DEFENDANT]: Yes, I have, your Honor.

THE COURT: All right. And you are in agreement with your Counsel, first, not to call your mother as a witness in this case?

[DEFENDANT]: Yes, I agree, your Honor.

THE COURT: You agree to that. You understand there's a trial strategy and there are positives and negatives, all of those that I'm sure you discussed with your counsel?

[DEFENDANT]: Yes, your Honor.

THE COURT: All right. I will accept that, then, that you have full knowledge of that."

¶ 29    The court also admonished defendant as to his right not to testify, and defendant asserted he consulted with counsel and decided to rest.

¶ 30    In closing, defense counsel noted that his opening statement referenced an alibi, but "[s]ometimes trial strategies change and in this case they changed after the evidence was heard and the [d]efense determined that it was not necessary because we believe the [S]tate had not proven their case beyond a reasonable doubt." Counsel argued, in relevant part, that discounting Karina, all other witnesses lied or exaggerated events and that Jose's identification was vague and unreliable, especially given the time of night and weather. Counsel also challenged the officers' investigation and argued they lied to buttress their case against defendant. Moreover, the State did not prove that defendant knew he was not authorized to use the debit card.

¶ 31    During deliberations, the jury asked to see the surveillance video, which was published again. The jury found defendant guilty on both counts.

¶ 32    Defense counsel filed a motion for a new trial, arguing, in relevant part, that the State failed to prove him guilty of burglary or identity theft beyond a reasonable doubt. The court denied the motion. After a hearing, the court sentenced defendant to concurrent terms of three years' imprisonment and denied his motion to reconsider sentence.

¶ 33    On appeal, defendant argues that defense counsel was ineffective because he promised the jury in his opening statement that defendant had an alibi and would present such testimony, but subsequently rested without producing such evidence.

¶ 34    We review claims of ineffective assistance of counsel using the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To establish a claim of ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) the deficient performance prejudiced defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. A defendant must satisfy both prongs to raise a successful claim. *Id.* Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 35    Decisions regarding which witnesses to call and what evidence to present are matters of trial strategy and are thus generally immune from claims of ineffective assistance of counsel. *People v. Munsen*, 206 Ill. 2d 104, 139-140 (2002). A defendant is entitled to competent rather than perfect representation, and mistakes in strategy or tactics do not, of themselves, render counsel's representation incompetent. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Due to the "variety of factors" affecting trial strategy, "such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002).

¶ 36    This court has found ineffective assistance where counsel promises the jury that it would hear particular testimony, but thereafter breaks that promise. See *People v. Briones*, 352 Ill. App. 3d 913, 919 (2004). Nevertheless, counsel's failure to provide promised testimony is not ineffective assistance *per se*. *People v. Manning*, 334 Ill. App. 3d 882, 892 (2002). A defendant can overcome the strong presumption that the challenged action or inaction of counsel may have resulted from sound trial strategy if " 'counsel's decision appears so irrational and unreasonable

that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Wilborn*, 2011 IL App (1st) 092802, ¶¶ 80-81 (quoting *People v. King*, 316 Ill. App. 3d 901, 916 (2000)).

¶ 37    Initially, the State argues defendant is precluded from claiming counsel was ineffective for not calling an alibi witness because defendant affirmatively acquiesced to the change prior to closing arguments. We agree. Before resting, defense counsel informed the court he no longer intended to call defendant's mother as an alibi witness. The court then spoke with defendant and ensured that he discussed the trial strategy and its "positives and negatives" with counsel and agreed not to call his mother. Defendant responded affirmatively. Accordingly, defendant acquiesced to counsel's tactical decision not to present an alibi witness, and is therefore precluded from raising an ineffective assistance argument on this basis. See *People v. Lyons*, 213 Ill. App. 3d 617, 621 (1991) (finding waiver of ineffective assistance claim where the judge, defendant, and defense counsel conversed regarding counsel's tactical decision not to request a second-degree murder instruction, the judge "did everything he possibly could do to advise the defendant," and the defendant nonetheless agreed not to request the instruction).

¶ 38    Further, defendant has not overcome the presumption that counsel engaged in sound trial strategy. The record does not reveal the reasons counsel decided not to present defendant's mother as an alibi witness. See *Manning*, 334 Ill. App. 3d at 893 ("We cannot determine from the record presented whether counsel's decision to abandon the defense of necessity was due to [the] defendant's choice not to testify, sound trial strategy or incompetence *** Therefore, we must presume it was the result of trial strategy.") According to defense counsel's opening statement, the promised alibi defense would have established that defendant was at home speaking with his

girlfriend on Facetime during the burglary. Counsel could have decided the jury would not have believed the alibi defense where the State's evidence established that defendant used the stolen debit card mere moments after its theft. Counsel could also have determined that the jury would not believe defendant's mother's testimony, because of her relation to defendant. See, *e.g.*, *People v. Flores*, 128 Ill. 2d 66, 106-07 (1989) (defense counsel was not ineffective for failing to call family members as alibi witnesses where counsel could have concluded that their testimony was unreliable). Thus, defendant has failed to establish that counsel's decision not to present defendant's mother was so irrational and unreasonable that no reasonably effective defense attorney would pursue the same strategy. See *Wilborn*, 2011 IL App (1st) 092802, ¶¶ 80-81.

¶ 39    Nor has defendant established that other circumstances surrounding counsel's decision warrant a finding of ineffectiveness. See *Fuller*, 205 Ill. 2d at 330-331. Although the defense did not present evidence, counsel assiduously cross-examined the State's witnesses and objected appropriately. During closing arguments, counsel informed the jury that he no longer intended to present an alibi where the State failed to meet its burden and its witnesses were not credible. Because counsel's performance was not objectively unreasonable, defendant's ineffective assistance claim fails and we need not decide the question of prejudice. See *Strickland*, 466 U.S. at 688-89.

¶ 40    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41    Affirmed.