2024 IL App (1st) 220286-U

No. 1-22-0286

Order filed July 15, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 12118 |
| | ) | |
| DESHAUN MCKINNEY, | ) | The Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant was entitled to a new trial where faulty juror admonishments resulted in plain error and the trial court's exclusion of prior consistent statements, offered to rebut an inference that a witness recently fabricated his testimony, was not harmless.

¶ 2     Following a jury trial, defendant DeShaun McKinney was convicted of first-degree murder and received concurrent 45-year prison terms. On appeal, he asserts that (1) the trial court failed to adequately admonish prospective jurors; (2) the court erred by precluding evidence of prior consistent statements to rebut the inference that a witness's testimony was a

recent fabrication; (3) the State's closing arguments were improper; (4) the court's inquiry into defendant's *pro se* ineffective assistance of counsel claim was inadequate; (5) the court erroneously discharged his public defenders without admonishing him about the waiver of counsel; (6) newly discovered evidence warranted a new trial; and (7) his sentences for two counts of first-degree murder violated the one-act, one-crime doctrine. For the following reasons, we reverse and remand for a new trial.

¶ 3                                    I. Background

¶ 4                                    A. Trial

¶ 5      Defendant and codefendant Douglas Brown were charged with the first-degree murder of Randy Streeter and were tried simultaneously before separate juries. The State's theory was that defendant and codefendant mistook Streeter and his friends for rival gang members, leading codefendant to give defendant a gun and defendant to fire that gun at Streeter.

¶ 6      At trial, 51-year-old Melvin Johnson testified that at about 9 p.m. on March 24, 2012, he walked to 63rd and Seeley to meet Streeter and their friend Kevin Winters. Streeter was 47 or 48 years old and Winters was about 53 years old. The trio then walked eastbound on 63rd Street toward Honore to buy heroin. As they did so, they saw three to five males who looked "crazy."

¶ 7      Johnson and his friends crossed the street and continued walking eastbound. The other group did as well. Consequently, Johnson's group turned onto Wolcott, heading north. Multiple shots were then fired behind them and they ran. Streeter said, "Mel, Mel, I'm hit," before collapsing in the alley. Johnson pulled Streeter from the middle of the alley, moved back his shirt and saw a blood stain over his heart. Meanwhile, Winters flagged down police officers, who called for an ambulance. Johnson subsequently learned that Streeter had died. Johnson was unable to identify anyone as the shooter.

¶ 8     Assistant medical examiner Kirsten Howell testified that Streeter was shot from a distance of at least three feet. A bullet went through his right arm before entering his chest, right lung, heart and left lung, and was recovered from his chest. The manner of death was homicide.

¶ 9     Timothy Harvey, one of the State's two key witnesses, had prior convictions for aggravated unlawful use of a weapon and misdemeanor aggravated assault. He testified that he did not know defendant or codefendant, was not near 63rd and Wolcott with them on the night in question and did not see anyone possess or fire a gun that day. In addition, Harvey was presently in custody for contempt, as he had failed to comply with a subpoena to appear in this case. He stated, "I ain't come to court because I ain't trying to tell no lie."

¶ 10    Harvey testified that in April 2013, while he was on house arrest, three detectives came to his home. He told them, "I can't say nothing if I wasn't there." Additionally, Harvey was apparently under curfew at the time of the shooting. Still, the officers wanted him to say that codefendant handed defendant a gun and defendant shot Streeter. Harvey testified that he did not recognize anyone in the photos, but the officers said "this case would be put on me" if he did not sign photographs of defendant and codefendant. Harvey also acknowledged signing a photo of someone he knew as "Izzot," but denied writing underneath the photo that "Shaun did it, shooting." Later, Harvey stated he had written that because the officers forced him to. Similarly, the officers forced him to sign a photo of a person he knew as "Two." This was a photo of codefendant. Harvey denied, however, that he was the individual who wrote under codefendant's photo that he was with defendant when he fired the gun.[1] Defendant eventually acknowledged in court that codefendant was his cousin.

---

[1] Harvey testified that he could write but not read. We note that the writing on the photo arrays contained significant misspellings.

¶ 11     Despite adopting the detectives' rendition of the shooting, on May 22, 2013, Harvey was arrested for Streeter's murder and kept in an interrogation room for two days. Harvey said he was not at the shooting, but the detectives told him he would be charged with Streeter's murder unless he said what they wanted him to say. Consequently, Harvey told the detectives what the officers wanted to hear and he was released.

¶ 12     Harvey was also asked numerous questions about his prior testimony before the grand jury that indicted defendant. His answers alternated between (1) denying giving the testimony, (2) not remembering the testimony, or (3) claiming that he was forced to give false testimony. Harvey testified, "I had to repeat everything they said or I was going down." Harvey maintained that he told the assistant State's Attorney (ASA) that he was not at the shooting, but the detectives wanted him to testify to something different. After he testified falsely before the grand jury, he was released.

¶ 13     According to the portion of Harvey's grand jury testimony that was published at defendant's trial, Harvey, defendant, codefendant, B-Ride and Devontae Young were shooting dice in front of Shakita's home at 63rd and Wolcott on the night in question. Codefendant, his cousin, may have received a phone call. Subsequently, a girl yelled that "opps" were coming. That term referred to rival gang members. Following the announcement, codefendant walked toward the gangway and alley but returned. The five men then walked closer to the area where Harvey understood the "opps" to be coming from. Defendant said to codefendant to "give it to me," after which codefendant handed him a gun. Defendant fired several times toward 63rd street. Afterward, Harvey and his companions approached the person who had been hit and saw that the victim was not a rival gang member. He looked older. The five men then ran in separate directions.

¶ 14 Harvey further testified before the grand jury that when the police came to his home, he circled defendant's photo and wrote on it that defendant had done the shooting. He identified codefendant from a second photo array and wrote that codefendant had been with defendant at the shooting. Harvey also spoke freely and voluntarily with the ASA. No one threatened him or promised him anything.

¶ 15 During Harvey's trial testimony, defense counsel attempted to elicit further testimony that Harvey told the police following his arrest in this case that he was not at the shooting, but the trial court sustained the State's objection on the basis that such testimony would constitute an inadmissible prior consistent statement.

¶ 16 Court reporter Ivy Schaefer testified that the transcript of Harvey's testimony before the grand jury was accurate. That transcript was then admitted into evidence. [2]

¶ 17 Emmanuel Carter, the State's second key witness, testified that he was 33 years old and was presently in custody for a misdemeanor drug case in Michigan.[3] When he was finished testifying against defendant, he would be transferred to Wisconsin to address pending fraud and battery charges. Additionally, he had fraud proceedings pending in Florida and Michigan. Carter's felony convictions included escape, driving under the influence, theft, possession of a controlled substance and a felony traffic offense.

¶ 18 Carter remembered "[b]its and pieces" about the day of the shooting. He was playing dice outside with about 10 people, including defendant, codefendant and Harvey. It was not dark out,

_____

[2] In portions of the grand jury transcript that were not published for the jury, Harvey testified that (1) he initially told the police that he was not present for the shooting; (2) he spoke to the ASA, in the presence of a detective, immediately prior to his testimony; (3) he told the ASA that he had not seen anything; and (4) such representations to the police and the ASA were false.
[3] Immediately before Carter's trial testimony, he refused to enter the courtroom unless it was cleared of civilians. The court told the sheriff to inform him that that was not possible and that "if we have to bring him back every single day for the rest of his natural life, he is going to ultimately have to go into the courtroom and testify."

but streetlights were on. In addition, Young was present, although he was not playing dice. Other groups of people were also congregating at nearby houses. Carter did not recall codefendant receiving a phone call and denied that codefendant said something to Carter's group. While Carter did not know if codefendant had a gun, at some point, shots rang out. Carter did not remember seeing defendant fire a gun.

¶ 19    Carter first spoke to the police about this case in May 2012, when he was subjected to a traffic stop. In November 2012, Carter again spoke with the police about this case when he was arrested for a gun case, although he did not possess a gun at that time. Carter denied knowing anything about a murder, but was essentially forced to make a statement due to the threat of a gun charge. After Carter spoke to the police, they took him home and did not charge him.

¶ 20    Carter testified that he was brought to the police station again in August 2013. He talked to the police and an ASA, albeit not voluntarily, and made a statement based on statements that other people had made. He did not recall saying that codefendant received a phone call or said that "opps" were coming. Carter did not recall whether he said that defendant told codefendant "to get his move," meaning a gun, or that codefendant subsequently handed defendant a gun. Furthermore, Carter did not remember saying that defendant retrieved the gun from codefendant and began firing at a group of men walking down 63rd Street.

¶ 21    Carter continued to testify that in 2014, he appeared involuntarily before the grand jury after being charged with criminal contempt. He had been taken into custody for failing to comply with a prior subpoena to appear in the grand jury proceedings. The judge in the contempt proceeding said, "you are going to be here until you take care of what needs to be taken care of." Outside the grand jury room, police officers were "basically telling me what to say" based on the statement he had made at the police station. He also spoke to an ASA. According to Carter, his

6

grand jury testimony repeated what the police told him, although he could no longer recall the substance of his grand jury testimony. Carter further claimed that an officer was in the room during his testimony, but he told the grand jury that his answers on the videotaped statement were given freely and voluntarily. When he finished testifying before the grand jury, he was released.

¶ 22    According to the portions of the grand jury testimony published for defendant's jury, Carter and his companions were shooting dice when codefendant received a phone call and said that "opps," meaning rival gang members, were coming down the street. Defendant then told codefendant to pass him "the move," referring to a gun. Codefendant retrieved a gun from the porch and passed it to defendant. Subsequently, defendant, codefendant, Harvey and Young, who was now deceased, ran north on Wolcott toward 63rd Street. There, Carter saw three men walking eastbound toward Honore, notwithstanding that 63rd Street was experiencing a blackout. At that point, defendant, codefendant, Harvey and Young headed in the direction of the three men. At the corner of 63rd and Wolcott, defendant raised his arm and began shooting northeast toward those men. Defendant and his companions then ran back toward the dice game, and everyone disbursed. Before the grand jury, Carter identified defendant's photograph.

¶ 23    ASA Jamie Santini testified that when he met with Carter prior to his grand jury testimony, Carter was in custody for criminal contempt due to his failure to comply with a subpoena to appear previously before the grand jury. That citation did not require Carter to testify in a certain manner, however. In addition, a detective may have been present when ASA Santini prepared Carter to testify in that proceeding, but no police officers were in the room during his testimony. Furthermore, the grand jury transcript was accurate. Following Carter's

testimony before the grand jury, the contempt proceeding was dismissed. The transcript of Carter's grand jury testimony was admitted into evidence.[4]

¶ 24    Sergeant Clifford Martin testified that he and his partner, Detective Shirley Coleman, were assigned to investigate this case. Sergeant Martin learned from Johnson, Streeter's companion, that Johnson had seen 10 to 12 people on 63rd Street and heard 10 to 12 shots when he reached Honore. Despite this information, the police were unable to identify a crime scene.

¶ 25    In May 2012, Sergeant Martin learned that other officers had stopped and interviewed Carter, who provided names that the police needed to look into, but Carter was released before Sergeant Martin could speak with him. Until Carter provided those names, the case "was a total mystery." Sergeant Martin then issued an investigative alert for Carter, who had provided an erroneous address. When Carter was arrested for possession of marijuana in November 2012, another detective interviewed him about this case. After that conversation, the police wanted to speak with Harvey. Furthermore, defendant and codefendant became possible suspects.

¶ 26    In April 2013, Harvey, a convicted felon, was on house arrest. Officers including Sergeant Martin interviewed him at home in the presence of his mother. Harvey was not threatened or offered anything. Based on the details that Harvey gave, it was apparent that he was at the shooting. Harvey also mentioned defendant and codefendant. From a photo array, Harvey identified defendant and wrote below the array that defendant was the shooter. Harvey identified codefendant from a second photo array and wrote that codefendant was with defendant when he shot the victim.

---

[4] The unpublished portions of the grand jury transcript show that Carter testified both that there was a blackout and that 63rd Street was "all lit up." He also testified that he volunteered information about the shooting during a traffic stop.

¶ 27    On May 22, 2013, Harvey was arrested for Streeter's murder, as Harvey's involvement was unclear. He spent two days in a small interview room with no mattress or blanket, although a mattress was available if desired. He was provided with food and drink, and was permitted to use the restroom. Sergeant Martin and Detective Coleman spoke with him, but he was not charged. Harvey was not promised anything and never said that he could not read.

¶ 28    Carter, who was under arrest for an unrelated offense, was brought to the police station on another investigative alert on August 2, 2013. Sergeant Martin first interviewed him outside the presence of the ASA, but the sergeant had no notes of that interview. In addition, Carter consented to the recording of his interview, which occurred in the presence of ASA Natalie Howse. Portions of the video were published for the jury. Although our record does not contain the complete video, it shows Carter stating that defendant was the person shooting. Defendant and codefendant were not arrested until June 2014.

¶ 29    Sergeant Martin testified that Carter was arrested in several other cases during this investigation. Carter cooperated but only when he had to: "he was caught doing something else and then he decided he wanted to talk to us about this." Carter would not return phone calls and gave the police invalid addresses. Still, Sergeant Martin never told Carter he would be charged with this murder or another gun offense. Although Sergeant Martin was not allowed in the grand jury room, he was present when the ASA interviewed Harvey immediately before his grand jury testimony. Sergeant Martin did not speak to him, however. Similarly, Sergeant Martin was present when the ASA interviewed Carter just before his grand jury testimony. After Carter testified, he was released from custody.

¶ 30    During defense counsel's cross-examination of Sergeant Martin, counsel attempted to elicit testimony that Harvey had first told the sergeant that he was not at the shooting. Once

9

again, the trial court sustained the State's objection on the basis that such testimony would constitute an inadmissible prior consistent statement and rejected defense counsel's argument that an exception existed because the prior consistent statement would rebut an inference of a recent fabrication. The court subsequently denied defense counsel's motion to reconsider.

¶ 31    The jury found defendant guilty of first-degree murder, during which he personally discharged a firearm that proximately caused Streeter's death.[5] Codefendant was acquitted.

¶ 32                                B. Posttrial Proceedings

¶ 33    Defendant then filed a *pro se* motion for a new trial and a *pro se* motion for a hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 34    The *pro se* motion for a new trial asserted that an attached affidavit from codefendant constituted newly discovered evidence warranting relief. According to codefendant, on the day of the shooting, he, defendant, Carter, Young and others participated in a dice game. Harvey was not present. At about 6 p.m., defendant went home because he was under probation curfew. At some point, codefendant received a phone call informing him that the Insane Gangsters were coming toward Wolcott. He then informed the group and got Young's gun from Baby Chris's porch. When Young told codefendant to give him the gun, codefendant did. As they walked toward 63rd Street, they saw three men walking from Damen toward Wolcott. When Young called out to ask who they were, the three men ran. Young began shooting, striking one of them.

---

[5] During deliberations, the jurors asked to see the video clips of Carter's statement. They also asked whether the prosecution and defense saw the same video and whether the defense could have used different parts of the video as evidence. In response, the court sent the published video clips back to the jury, told the jury that it had all the evidence, and reminded it that the State had the burden of proof. We also note when deliberations began, one juror asked when deliberations would end, as she had a Marc Anthony concert to attend. The juror was told that the court did not control the length of deliberations.

Codefendant did not know Young was going to shoot at unknown people and only retrieved Young's gun for protection. Defendant was at home when Young shot Streeter.

¶ 35     Codefendant further alleged that he had initially given Sergeant Martin the foregoing account. He substituted defendant for Young, however, when the police showed him the statements made by Carter and Harvey. While codefendant would not have testified for defendant while codefendant's own trial was pending, he was now willing to testify.

¶ 36     Defendant's *Krankel* motion asserted that trial counsel was ineffective for convincing him not to testify and for failing to present alibi testimony from his sisters, Taijah and Kanesha McKinney, both of whom were listed as defense witnesses. Although defendant was represented by two public defenders, his arguments were directed at lead counsel. Defendant would later supply affidavits in support of his *Krankel* motion.

¶ 37     Taijah's affidavit alleged that defendant was home before 7 p.m. on the night in question. She remembered because she and Kanesha were watching a movie when defendant came home and changed the channel to watch March Madness. Taijah was mad but the three of them then watched basketball together. We note that Taijah's affidavit did not specify whether counsel spoke with her regarding her alibi testimony.

¶ 38     According to defendant's affidavit, he wanted to testify that he was at home on curfew at the time of the shooting, but defense counsel said a jury would not believe that, as he had violated his curfew in 2012. Defendant alleged that while he received a curfew violation, he had been able to prove that the doorbell was not working, and his probation officer started knocking on his room window instead.[6] Aside from defendant's own testimony, he and counsel had planned for his sisters to testify as alibi witnesses.

---

[6] Defense counsel filed a motion *in limine* to prevent the State from entering into evidence the fact that defendant was on probation at the time of the murder. That request was granted.

¶ 39     The affidavit of Alissia McKinney, defendant's mother, stated that when she asked trial counsel if he was going to put witnesses on the stand, counsel replied that he did not need to because the State's witnesses had changed their story. Defendant's father, Marvin McKinney, submitted a similar affidavit.

¶ 40     Defendant's attorneys filed their own motion for a new trial, asserting that the trial court erroneously prevented counsel from questioning Harvey and Detective Martin about Harvey's prior consistent statement in order to rebut an inference that he recently fabricated his trial testimony that he was not at the shooting.

¶ 41     On January 10, 2019, defendant informed the court that he had a new attorney, who was not in court that day. The court then permitted the public defenders to withdraw but stated that their motion for a new trial would be kept on file. Almost eight months and several court appearances later, the new attorney told the court he had chosen not to file an appearance on defendant's behalf. Defendant's subsequent efforts to obtain a new attorney proved unsuccessful and the court denied his request to appoint a different public defender. At one point, his prior public defenders were reappointed at defendant's request, only to be discharged once more.

¶ 42     In January 2020, argument ensued on defendant's *Krankel* motion. He maintained that trial counsel was ineffective for failing to present the aforementioned evidence on his behalf. The court denied that motion without speaking to the public defenders who had represented him. Specifically, the court found it was a matter of trial strategy not to present defendant's alibi witnesses and defendant had been admonished regarding his right to testify.

¶ 43     A week later, the trial court denied defendant's motion to reconsider the denial of his *Krankel* motion and proceeded to argument on his motion for a new trial. He argued, in pertinent

part, that codefendant's affidavit, naming Young as the shooter and stating that defendant was not present, entitled him to a new trial. He also argued that the jury should have been permitted to hear evidence of Harvey's prior consistent statement. The court denied that motion as well as his subsequent motion to reconsider. Ultimately, the court imposed concurrent 45-year prison terms on two counts of first-degree murder.

¶ 44                                              II. Analysis

¶ 45                                        A. Jury Admonishments

¶ 46     On appeal, defendant asserts, the State concedes, and we agree that the trial court failed to properly admonish prospective jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Specifically, the trial court did not ascertain whether the venire understood the principles enumerated in Rule 431(b). *Id.* (requiring the court to ascertain whether a potential juror "understands and accepts" certain principles); *People v. Wilmington*, 2013 IL 112938, ¶ 32 (stating that "the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself"). The State argues that defendant is not entitled to relief, however, because he failed to preserve this issue below and this violation of the rule did not otherwise amount to plain error.

¶ 47     The failure to object to an error at trial or raise the error in a posttrial motion results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48. Yet, the plain-error doctrine permits reviewing courts to consider unpreserved error where either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant"; or (2) the error was of a fundamental magnitude, affecting the fairness of the trial and integrity of the judicial process. *Wilmington*, 2013 IL 112938, ¶ 31. Under the first prong, which is at issue in this case, reviewing courts must evaluate all of the evidence and, using common sense, conduct a qualitative

assessment within the context of the specific case. *People v. Logan*, 2024 IL 129054, ¶ 71. This assessment includes consideration of any evidence as to the witnesses' credibility. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 48　　While the evidence was sufficient, we agree with defendant that the evidence was closely balanced. On the one hand, Harvey and Carter both testified before the grand jury that defendant shot Streeter. On the other hand, Harvey testified at trial that he was not present for the shooting and Carter testified that he did not see anything. The State presented no physical evidence tying defendant to the shooting and defendant made no inculpatory statements. *Cf. People v. Anderson*, 2012 IL App (1st) 103288, ¶ 51 (stating, where physical evidence connected the defendant to the shooting, that a witness's recantation of his written statement and grand jury testimony did not render the evidence closely balanced).

¶ 49　　We categorically reject the State's representation that the grand jury testimony of Harvey and Carter was uncontradicted: the recantations themselves contradicted their grand jury testimony. Although recantation testimony is suspect (*People v. Beard*, 356 Ill. App. 3d 236, 242 (2005)), Harvey and Carter's grand jury testimony was equally problematic.

¶ 50　　Harvey, a convicted felon, was himself a suspect in Streeter's murder and codefendant is his cousin. Thus, even when he testified before the grand jury, he was not a disinterested witness. In addition, Harvey later claimed that his grand jury testimony was the product of coercion. We further note that while Harvey's grand jury testimony claimed that he and his companions approached Streeter after the shooting, Johnson, who stayed with Streeter after he was shot, made no mention of anyone approaching them afterward. Carter's grand jury testimony did not mention that either.

¶ 51    As for Carter, his felonies included fraud, a crime of dishonesty. Sergeant Martin testified that Carter only cooperated when he was caught doing something else and had to cooperate. Additionally, Carter only appeared before the grand jury under the threat of contempt. In short, the State's own evidence portrayed Carter as a witness willing to sing for his supper. Carter, like Harvey, further claimed that police pressure led him to identify defendant as the shooter.

¶ 52    For those reasons, the evidence was closely balanced and the trial court's failure to comply with Rule 431(b) amounted to plain error. We therefore reverse and remand for a new trial.

¶ 53                              B. Prior Consistent Statements

¶ 54    We also reverse and remand for a new trial because the trial court abused its discretion by prohibiting defense counsel from eliciting testimony from Harvey and Sergeant Martin that Harvey initially told police that he was not present for the shooting. Defendant argues that such evidence was admissible to rebut the inference that Harvey recently fabricated his trial testimony that he was not present at the shooting.

¶ 55    While the State does not concede that error occurred, the State does not dispute it either. Instead, the State contends that any error was harmless.

¶ 56    A witness's prior consistent statement is generally not admissible for the purpose of corroborating the witness's trial testimony. *People v. Thomas*, 278 Ill. App. 3d 276, 281 (1991). That being said, "prior consistent statements are admissible to rebut a charge or an inference that the witness is motivated to testify falsely *or that his testimony is of recent fabrication*, and such evidence is admissible to show that he told the same story before the motive came into existence *or before the time of the alleged fabrication*." (Emphases added.) *People v. Williams*, 147 Ill. 2d 173, 227 (1991). Thus, the exception for charges of recent fabrication is separate from the

exception for charges of a motive to testify falsely. *People v. Mullen*, 313 Ill. App. 3d 718, 730 (2003); *People v. Lambert*, 288 Ill. App. 3d 450, 453 (1997). Under the former exception, which is at issue here, the party seeking to introduce the prior consistent statement has the burden of demonstrating that the prior statement was made before the alleged fabrication occurred. See *Mullen*, 313 Ill. App. 3d at 730; but see *People v. Grisset*, 288 Ill. App. 3d 620, 626-27 (1997) (stating that the recent fabrication exception requires demonstrating that the prior statement was made before the witness had a motive to testify falsely). If this burden is met, the prior consistent statement may be used to rehabilitate the witness, but is not admissible as substantive evidence. *People v. Randolph*, 2014 IL App (1st) 113624, ¶ 15. We review the trial court's ruling on the admissibility of evidence for an abuse of discretion, which occurs when the court's decision is fanciful, arbitrary or unreasonable, or when no reasonable person would agree with the court's position. *People v. Brand*, 2021 IL 125945, ¶ 36.

¶ 57    At trial, Harvey denied being present at the shooting or seeing defendant fire a gun. The State then impeached Harvey with his pretrial statement and grand jury testimony stating that he was present for the shooting and saw defendant shoot Streeter. This clearly raised the inference that Harvey had recently fabricated his trial testimony. To rebut that inference, defendant sought to have Harvey and Sergeant Martin testify that even earlier, Harvey had denied being present for the shooting. Such testimony was admissible to impeach Harvey's grand jury testimony and police statement claiming to have seen defendant shooting. We find the trial court abused its discretion by preventing defendant from presenting Harvey's prior consistent statement through Harvey himself and Sergeant Martin.

¶ 58    We also reject the State's assertion that the error was harmless. Unlike plain error review, the burden of showing an error was harmless rests with the State. *People v. Dorsey*, 2023 IL App

(1st) 200304, ¶ 66. An erroneous evidentiary ruling is harmless where the State demonstrates beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 63. We may also examine other properly admitted evidence to determine whether it overwhelmingly supported the conviction or consider whether the improperly admitted evidence was merely cumulative. *Id.*

¶ 59    As stated above, the evidence was not overwhelming. The case required the jury to decide whether it believed Harvey and Carter's trial testimony or their grand jury testimony. Evidence that Harvey had first told police that he was not at the shooting could tip the balance in favor of Harvey's trial testimony and, in turn, Carter's trial testimony. *Cf. People v. Short*, 2014 IL App (1st) 121262, ¶ 103 (finding the failure to allow evidence of the defendant's prior consistent statement was harmless where the evidence was substantial, and the defendant admitted he shot the victim).

¶ 60    The State observes that Harvey did manage to testify a single time at trial that he initially told the officers who came to his home that he was not present for the shooting, notwithstanding that defendant was not permitted to present additional evidence of Harvey's prior consistent statement. The State argues that as a result, any further evidence of Harvey's prior consistent statement would be cumulative and could not impact the jury's verdict. Yet, a jury would be more likely to believe Sergeant Martin's testimony that Harvey first denied being at the shooting than Harvey's own self-serving testimony. We further note that defendant contends the court's ruling prevented him from introducing the entirety of Harvey's prior consistent statement. Accordingly, the State has not met its burden of showing the error was harmless, entitling defendant to a new trial.

¶ 61                                C. Remaining Issues

¶ 62     In light of our prior determinations, we need not address defendant's remaining contentions. We nonetheless note that we would reverse and remand for new posttrial proceedings if we were not reversing and remanding for a new trial.

¶ 63     Defendant asserts, the State concedes, and we agree that the trial court's inquiry into defendant's *pro se* posttrial ineffective assistance of counsel claim was inadequate. See *People v. Jolly*, 2014 IL 117142, ¶ 30 (recognizing that an inquiry under *Krankel* usually requires the court to engage in some interchange with trial counsel to assess the facts and circumstances underlying the allegations and determine what further action, if any, is warranted). Additionally, defendant, the State and this court agree that the trial court failed to admonish defendant under Illinois Supreme Court Rule 401(a) (eff. July 1, 1981) before permitting him to proceed *pro se* after trial.

¶ 64     We would have further ordered the trial court to permit defendant to present codefendant's live testimony at an evidentiary hearing instead of denying defendant's motion for a new trial based on codefendant's cold affidavit. Nothing in the affidavit renders codefendant's allegations categorically unbelievable. C*f. People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 27 (stating, where the State presented the testimony of the defendant's accomplice, that such testimony "should be viewed with suspicion and accepted only with great caution, especially where the witnesses were promised leniency or where the testimony was induced with a grant of immunity"). Taking them as true, the evidence was newly discovered, material and potentially of such a conclusive character that it would probably change the result on retrial. See *People v. Molstad*, 101 Ill. 2d 128, 134-35 (1984) (finding codefendants' testimony was newly discovered where they would have incriminated themselves by testifying at the defendant's trial); *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997); see also *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 (citing *People v. Ortiz*, 235 Ill. 2d at 336-37) (stating in the context of a postconviction petition

that "where newly discovered evidence is both exonerating and contradicts the State's evidence at trial, it is capable of producing a different outcome at trial"); *People v. Parker*, 2012 IL App (1st) 101809, ¶ 85 (stating that "[i]f believed," the affidavit submitted with the defendant's postconviction petition would be completely exculpatory where the affiant stated he would testify that the defendant was not present at the murder and played no part in it and where there was no physical evidence or eyewitness testimony, and the confession of the defendant, a high school student, was obtained after 15 hours in custody and multiple interrogations).

¶ 65                                    III. Conclusion

¶ 66    For the foregoing reasons, we reverse and remand for a new trial.

¶ 67    Reversed and remanded.